850 So.2d 514 (2003)
Micah Louis NELSON, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-876.
Supreme Court of Florida.
July 10, 2003.
*518 James Marion Moorman, Public Defender, and A. Anne Owens, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have for review a judgment of conviction of first-degree murder and sentence of the trial court imposing the death penalty upon Micah Louis Nelson. We have jurisdiction pursuant to article V, section 3(b)(1), of the Florida Constitution. For the reasons expressed below, we affirm Nelson's convictions and sentences for first-degree murder, burglary of a dwelling with a battery, grand theft (motor vehicle), kidnapping, burglary of a conveyance with a battery, and sexual battery.

FACTS
The evidence presented at trial indicated that during the early morning hours of November 17, 1997, Micah Louis Nelson (Nelson) entered Virginia Brace's (Brace) home by removing the screen and climbing through the bathroom window. Seventy-eight-year-old Brace had been in bed and her glasses and hearing aid were on her bedroom dresser. Nelson sexually assaulted Brace, took her car keys from her purse, and then placed her in the trunk of her own car. He drove around with Brace in the trunk for a period of hours and eventually drove to an orange grove, where he apparently intended to leave her. However, the car became stuck in soft sand and had to be pulled out with the assistance of machinery at about 9:30 a.m. on November 17, 1997.
Steven Weir, the heavy equipment operator who pulled the car out of the sand, felt a thud when he put his hand on the car's trunk. Nelson advised him that there was a dog in the trunk and then proceeded to turn up the car radio. The heavy equipment operator observed Nelson to be nervous and pacing, and Nelson would not look him in the eye when they spoke. Nelson sped off as soon as the car was lifted out of the sand and drove to another orange grove where he let Brace out of the trunk and walked her or dragged her 175 feet into the grove.[1] With Brace on the ground, Nelson attempted to strangle her with his bare hands, emptied the contents of a fire extinguisher into her mouth, and forced a tire iron into her mouth and through the back of her head.
At 3:30 p.m. on November 17, 1997, Joann Lambert noticed an unfamiliar car parked on the road behind her house. The car was still parked in the same location when it began to get dark that evening so she called the Highlands County Sheriff's Department. When Deputy Vance Pope arrived to investigate the car, he found Nelson asleep in the back seat. Deputy Pope also noticed an insurance card on the floorboard with the name Virginia Brace. Nelson told Pope that he borrowed the car from a family friend. Pope could not verify the vehicle's registration because the DMV computer was not working at that time. Pope would not allow Nelson to drive because he did not have a driver's license, so he gave Nelson a ride to Nelson's sister's house. Later that evening, Pope heard the name Virginia Brace over the police radio, which prompted him to *519 contact Sergeant Hofstra regarding his earlier contact with Nelson. Police recovered the car where Deputy Pope had last seen it, and it was identified as belonging to Brace.
At 11 p.m. on November 17, 1997, Deputy Pope returned to the house where he previously dropped off Nelson. Nelson agreed to be questioned by the Avon Park Police. After a series of interrogations on November 18, 1997, and November 19, 1997, Nelson showed the police where Brace's body was located and he confessed to killing her.
Nelson told police that some time after midnight, he broke into Brace's home through her bathroom window. He stated that he entered her bedroom and she woke up and started screaming. He said that they had a struggle on her bed, after which he took her car keys and placed her in the trunk of her car. Nelson stated that he drove around in the car for hours and that at one point he stopped to get gas. He then drove to an orange grove where he was going to kill Brace, but the car became stuck in the sand and he required help to extricate the car from the sand. He then took Brace to another orange grove where he and Brace walked into the grove. He stated that he started to choke Brace on the ground, but she did not pass out, so he sprayed a fire extinguisher into her mouth, which made her cough. He stated that he then took the tire iron and stuck it into her mouth until it came through the back of her neck and into the ground. He stated that Brace gasped for air when he pushed the tire iron into her mouth. Nelson denied having any sexual contact with Brace.
At trial, Dr. Melamud, the medical examiner, testified that the condition of Brace's body corresponded with her being dead for two days before she was found. He testified that Brace's injuries were consistent with asphyxiation, an object being forced into her mouth through the back of her neck, such as a tire iron, and a fire extinguisher being discharged into her mouth. He stated that she also suffered a crushed vertebra as a result of the compression of her neck and spinal cord, and three broken ribs. He testified that her death could have resulted from any one of those injuries, or a combination of them. Although he could not assign an order in which the injuries occurred, he stated that the medical evidence indicated that she was alive both when the object was forced into her mouth and through the back of her neck, and when the fire extinguisher's contents were expelled into her mouth.[2] He could not say with certainty if she was conscious when those injuries were inflicted, but he opined that if Brace had been conscious during the infliction of any of these injuries, she would have experienced severe pain.
Karen Cooper, a laboratory analyst with the Florida Department of Law Enforcement (FDLE), testified that prints made from boots recovered from Nelson's bedroom at his sister's house were consistent with boot prints found at the orange grove on the ground near Brace's body. Stephen Stark, a latent fingerprint examiner with FDLE, testified that Nelson's latent prints were found inside Brace's bathroom on the towel rack, on tiles under the bathroom window, on the bathroom tub, and on the bathroom door jamb. Stark, who also processed the crime scene at the orange grove, testified that there was a hole in the *520 ground beneath the back of the victim's head and that a yellow powdery substance was found on the ground where the body was located. He also testified that three prints found in the interior of the trunk were consistent with Brace's fingerprints. Stark stated that when he processed the car, the trunk liner was moist and smelled of urine. Jennifer Garrison, an FDLE crime lab analyst in the serology DNA section, testified that testing revealed the semen found on Brace's bedspread was consistent with Nelson's DNA profile. Darrin Esposito, an FDLE crime lab analyst in the serology DNA section, testified that he tested the vaginal swab taken in this case, and it was consistent with a mixture of DNA from both Brace and Nelson. Jeannie Eberhardt, a serologist with FDLE, testified that the swabbing of the tire iron found in the trunk of Brace's car came back positive for indications of blood.
The jury recommended a death sentence by a vote of nine to three and the trial court sentenced Nelson to death. The trial court found six statutory aggravators: (1) the defendant was previously convicted of a felony, was under a sentence of imprisonment, and was on felony probation, or controlled release, at the time of the murder; (2) the crime for which the defendant was to be sentenced was committed while the defendant was engaged in the commission of, or flight after, committing a sexual battery, burglary, or kidnapping; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (4) the murder was especially heinous, atrocious or cruel (HAC); (5) the murder was committed in a cold and calculated and premeditated manner, and without any pretense of moral or legal justification (CCP); and (6) the victim was particularly vulnerable due to advanced age or disability. The trial court found that all six aggravators were proven beyond a reasonable doubt and assigned five of them great weight. The trial court assigned little weight to the sixth aggravator of the victim being "particularly vulnerable due to age or disability."
The trial court addressed and rejected three statutory mitigating factors.[3] Twenty-one nonstatutory mitigating circumstances were addressed by the trial court:
(1) at the time of the offense the defendant was impulsive and his ability to exercise good judgment was impaired (not proven);
(2) defendant was remorseful for his conduct (not proven); (3) defendant did not plan to commit the offense in advance (not proven); (4) defendant demonstrated appropriate courtroom conduct and behavior (very little weight); (5) defendant is capable of forming loving relationships with family members and friends (very little weight); (6) any mental illness of the defendant may have been controlled by medication (little weight); (7) it is unlikely the defendant will be a danger to others while serving a life sentence in prison (very little weight); (8) defendant did not resist arrest, cooperated with the police, and showed the authorities where the body was located (moderate weight); (9) defendant never knew his father and lost his mother at a young age (moderate weight); (10) defendant had a troubled and neglected childhood (not proven); (11) defendant was the victim of inappropriate sexual conduct and abuse as a child (little weight); (12) defendant has organic brain damage (not proven); (13) defendant suffered from depression *521 as a result of his conduct and attempted suicide in the jail (little weight); (14) defendant had diminished educational experience (little weight); (15) defendant was sexually assaulted while in prison (some weight); (16) defendant has limited intelligence (some weight); (17) defendant has no prior violent felony convictions (little weight); (18) the circumstances which resulted in the homicide are unlikely to recur since the defendant will be spending the rest of his life in prison (some weight); (19) defendant has accepted responsibility for his action (not proven); (20) defendant has never received treatment for his mental or emotional problems (little weight); and (21) defendant was willing to plead guilty to all charges for consecutive life sentences without parole (very little weight).

ANALYSIS
Notwithstanding his challenge to the trial court's denial of the motion to suppress, we note that Nelson does not challenge his first-degree murder conviction. Despite the lack of challenge, we have examined the record and have determined that there was sufficient competent and substantial evidence presented to support the conviction for first-degree murder. See Brown v. State, 721 So.2d 274, 277 (Fla.1998). As reflected in this opinion, there was a plethora of physical evidence linking Nelson to Brace's home, Brace's car, and the orange grove where her body was found. Additionally, the physical evidence discovered in this case was consistent with Nelson's final admission to the police about how he committed the murder. We have referred to that evidence in some detail above.[4]

MOTION TO SUPPRESS
Nelson claims that the trial court erred in denying his motion to suppress statements and admissions. He maintains that he made incriminating statements as a result of police coercion because the police prematurely wrote "DNA evidence" on the board during interrogation, they employed the "Christian burial"[5] technique, and they continued to question him when he was fatigued. After hearing evidence at the hearing on the motion, the trial court denied the suppression motion.
This Court has recently explained the standard of review for orders on motions to suppress:
[A]ppellate courts should continue to accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.
Connor v. State, 803 So.2d 598, 608 (Fla. 2001). At the trial court level it is proper to apply a "totality of the circumstances" analysis when determining if a confession was obtained voluntarily. See Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); Thompson v. State, 548 So.2d 198, 203-04 (Fla.1989).
Avon Park Police Sergeant John Wayne Robinson testified that while Nelson was in a separate room taking a polygraph test, he made a "pro and con" list of *522 factors for and against Nelson on a wipe-off board.[6] Sergeant Robinson listed "DNA evidence" under the "con" category. Sergeant Robinson stated that at the time he and others were developing a strategy for interrogating Nelson with the board, he had been advised that evidence had been collected for future testing of DNA. The evidence thought to contain DNA included the victim's underwear, some cigarettes similar to the brand Nelson smoked, and fluids in the trunk. Sergeant Robinson stated that he actually had no information regarding any DNA testing results at that time.
The trial court considered the "DNA evidence" writing claim in light of all the evidence in the record, and concluded it was insufficient to establish coercion:
In the instant case, the police did not fabricate any documents, and the DNA evidence writing was not emphasized at the interview. The police did tell the defendant they had his fingerprint inside the victim's home, and this was the truth. The court finds that the writing of DNA evidence on the blackboard does not rise to a level that shocks the conscience and jeopardizes the constitutional rights of the defendant.
As noted above, we must accept the trial court's factual findings if there is evidence to support them, while reviewing the court's legal conclusions de novo. Upon review, we find no error in the trial court's evaluation that the simple listing of "DNA evidence" on the board was not such a substantial misrepresentation as to automatically render Nelson's confession involuntary. See Escobar v. State, 699 So.2d 984, 987 (Fla.1997) (holding that law enforcement tactics that "go too far" can cause confessions to be suppressed, but that "police misrepresentation alone does not necessarily render a confession involuntary"), abrogated on other grounds by Connor v. State, 803 So.2d 598, 607 (Fla. 2001).
It appears that the DNA listing was inherently ambiguous. While the DNA analysis had not yet been done, it was apparent at that point that DNA evidence had been seized and its analysis would probably play a role in assessing the evidence against Nelson, along with the evidence that already suggested his involvement. The listing did not state that the DNA had been tested and compared to a sample of Nelson's DNA. In fact, it is not clear that a sample of Nelson's DNA had ever been secured at that point. Thus, we find that the trial court did not abuse its discretion when it denied the motion on the basis that "DNA evidence" was written on the board in the interrogation room, before testing had actually been done for the presence of DNA.
Next, Nelson claims that his statements were coerced by improper use of the "Christian burial" technique. While police were questioning Nelson to see if he would aid in locating Brace's body, Sergeant Robinson asked Nelson whom he loved and Nelson answered that he loved his sister, Juldy. Sergeant Robinson then asked Nelson if he would be worried if Juldy was missing, and if he would expect the police to investigate it right and how he would feel if the person who knew what happened would not tell the police the truth. Sergeant Robinson asked Nelson to put himself in the victim's family's shoes *523 and imagine how they felt so that the police could help them and put their minds at ease because they were worried about her. Sergeant Robinson testified that he told Nelson, "[I]f she's dead help us find her so we can give her a proper burial just like you would expect for [Juldy] if she was killed." This statement apparently had some effect on Nelson because he began to cry and soon thereafter agreed to take the police to the victim's body.
In its order denying relief on this claim, the trial court stated, "The court finds that the detectives [sic] reference to finding the victim's body so that it could be buried is insufficient to make an otherwise voluntary statement inadmissible under Hudson v. State, 538 So.2d 829 (Fla.1989) and Alston v. State, 723 So.2d 148 (Fla.1998)."
In Hudson, after the defendant stated to police that the victim was dead and he had seen the body, a police sergeant asked him if he had ever been to a funeral and told him that most people do not go to funerals without a body. See 538 So.2d at 830. The sergeant told him that the family needed to put this situation to rest by seeing the body. See id. Upon review, this Court found that this interaction did not constitute the prohibited "Christian burial" technique that we have previously addressed, stating: "This Court has characterized the Christian burial technique as a `blatantly coercive and deceptive ploy.'... [H]owever, we find the sergeant's reference to finding the body so that it could be buried insufficient to make an otherwise voluntary statement inadmissible." Id.
In Alston, a detective testified at the suppression hearing that he felt the victim's mother needed closure because her son was still missing and he mentioned the fact that Alston had a daughter. See 723 So.2d at 155. The detective mentioned that if someone took Alston's daughter and he did not see her again, he would not get any closure. See id. The detective concluded by stating the victim's mother could get some closure if Alston took the police to the victim's body. See id. In rejecting a claim of coercion, this Court cited Hudson, stating: "[W]e do not find Detective Baxter's statement that appellant should show them where the body was located because Ms. Coon needed closure was sufficient to make an otherwise voluntary statement inadmissible." Id.
Both Hudson and Alston rely heavily on this Court's earlier analysis and decision in Roman v. State, 475 So.2d 1228 (Fla.1985). In that case, Roman made an incriminating statement to police after they asked him to tell them where the body was located for purposes of a Christian burial, although they had already located the body. See id. at 1230. This Court stated:
The use of the "Christian burial technique" by law enforcement personnel is unquestionably a blatantly coercive and deceptive ploy. The record shows, however, that the use of this tactic did not directly result in appellant's statement, although we consider it as a factor among the totality of circumstances surrounding the giving of this statement. The record reflects that appellant was a forty-five year old man of intelligence within the normal range, albeit at the lower end. He did not appear intoxicated or mentally ill at the time. He was read Miranda warnings, was capable of understanding them, and indicated that he did in fact understand them. He was offered sustenance and not promised or threatened. He was not handcuffed, and despite vomiting and trembling seemed alert and perceptive. Under these circumstances we find that the deception was insufficient to make an otherwise voluntary statement inadmissible.
*524 Id. at 1232-33. We find that the trial court properly evaluated the "Christian burial" evidence and did not err when it denied this suppression claim.
In the instant case, there was no police deception, nor did the police inject Christianity or any other religion into the exchange. As we stated in Johnson v. State, 660 So.2d 637 (Fla.1995): "Using sincerely held religious beliefs against a detainee is quite a distinct issue from a simple noncoercive plea for a defendant to be candid." Id. at 643. It also appears that the statements did not exacerbate an already coercive atmosphere to render Nelson's confession involuntary. Although Sergeant Robinson asked Nelson to put himself in the shoes of the victim's family and mentioned the need for a "proper burial," when those statements are viewed under the circumstances of the interview it appears that the burial speech was not patently coercive. Further, as in Roman, Nelson did not appear intoxicated or mentally ill at the time he waived his Fifth Amendment rights after being advised of them pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and he appeared to be capable of understanding his rights. He was given breaks and beverages and was not promised anything or threatened. Nelson was upset and crying during portions of interviews, but the police gave him breaks when he was visibly very upset. Thus, it appears that the trial court did not err when it denied this suppression claim on the basis of Hudson and Alston.
Nelson also claims police coercion because the police did not afford him breaks during interrogation when he was tired. The First District in Gaspard v. State, 387 So.2d 1016, 1022 (Fla. 1st DCA 1980), found that the defendant's incriminating statements that were made when he was "tired and exhausted" were properly suppressed because they were the product of four days of repeated and coercive interrogations. However, the trial court in the instant case noted that the record was replete with testimony about the police offering Nelson breaks and beverages during the interrogation sessions and found as follows:
The defendant was initially interrogated from late November 17 until around 8:30 a.m. November 18. At that time, [the police] suspended the interrogation until that night at 9 p.m. The latter interrogation lasted the majority of the night. The same detectives interviewed the defendant throughout the whole process. Detective Lethridge testified that the defendant was given three breaks during that latter period. The court finds that the defendant endured the same interview conditions as the inquiring detectives and that he was afforded several breaks. During these breaks the defendant was offered coffee or cold drinks and allowed to use the restroom. This interview period was not unreasonable.
A suspect's statement to police during an interrogation that he is tired does not necessarily indicate in itself a desire to reassert waived rights. See Johnson v. State, 660 So.2d 637, 643 (Fla.1995). Based on the record before us supporting the trial court's factual findings, we find that the trial court did not err when it denied suppression of Nelson's statements on the basis that he was fatigued.
In conclusion, because the trial court's factual findings were supported by the record and its legal conclusions are supported by the law of this state, we affirm the trial court's denial of the motion to suppress.

AVOID ARREST AGGRAVATOR
Nelson makes a two-part claim regarding the avoid arrest aggravator. He alleges that (1) the trial court erred by *525 not informing the jurors that when the victim is not a police officer, the primary or dominant motive must be to eliminate the witness or that the State's proof must be very strong; and (2) the trial court erred by finding the avoid arrest aggravator.
As to the avoid arrest aggravator instruction, we agree with the State that Nelson did not properly preserve this issue for review. Although the record reflects that Nelson filed a motion to declare sections 921.141 and 921.141(5)(e), Florida Statutes (1997), unconstitutional, Nelson did not specifically address the avoid arrest jury instruction in that motion. Further, Nelson did not object to the adequacy of the avoid arrest jury instruction at trial. This Court has held that the contemporaneous objection rule applies to Espinosa[7] challenges. See Hodges v. State, 619 So.2d 272, 273 (Fla.1993). Failure to make an objection at trial about a jury instruction will render it procedurally barred. See id. Because the record reflects that Nelson did not object to the avoid arrest aggravator jury instruction at trial, we find this issue procedurally barred.
The trial court found that Nelson's sole or dominant motive for the murder (of a victim who was not a law enforcement officer) was for the purpose of avoiding or preventing a lawful arrest. The trial court found that the aggravator was proven beyond a reasonable doubt and listed four factors that supported it as being Nelson's sole murder motive:
(1) The Defendant in his confession to the police said he killed the victim because he was afraid that Virginia Brace could identify him, "because she saw his face."
(2) Once he removed her from her home and placed her in the trunk of her car, she was no longer a threat to his escape.
(3) The Defendant placed the victim in the trunk of her car and drove her around over six hours. Thus he had ample opportunity to release the victim or simply leave her in the trunk. See Alston v. State, 723 So.2d 148, 160 (Fla.1998).[8]
(4) The victim was abducted from her home and transported to an isolated area where she was killed.
We conclude that Nelson's claim that the trial court erred in finding the avoid arrest aggravator is refuted by the record, including his own admissions.
After Brace's body was found, Nelson agreed to waive his rights and to speak with police. When Detective Sergeant Robinson asked why this happened, Nelson responded that he was mad at the world and mad about his life. When Nelson was describing his encounter with Brace in her bedroom, he related that she was screaming and when Sergeant Robinson asked, "And you were saying you didn't want to leave because of what reason?" Nelson replied, "(Inaudible) she would call the police." Sergeant Robinson then asked, "So you were worried about her calling the police if you left?" Nelson *526 replied, "Yes." Sergeant Robinson asked Nelson, "Why did you put her in the trunk?" Nelson replied, "So no one would see." Nelson expressly agreed with the police when they asked him if he killed Brace because he felt like she could identify him. In fact, when Nelson was asked how Brace could identify him in the dark, he replied, "From the bathroom light." Later on in the interview, Sergeant Robinson asked Nelson, "So what made you kill Ms. Brace?" Nelson answered, "I got scared." Thus, the record reflects that Nelson's own explanations about why he killed Brace consistently related his concerns about her identifying him. See Walls v. State, 641 So.2d 381, 390 (Fla. 1994) (stating that the defendant's argument that the avoid arrest aggravator was improperly found was without merit "because it is directly refuted by the record and Walls' own words").
Although Nelson's admissions to police alone support his intentional elimination of Brace as a witness, other considerations also support the avoid arrest aggravator in this case. For example, when evaluating the avoid arrest aggravator, this Court has stated that it will look at whether the victims knew and could identify their killer, but that this fact alone is insufficient to prove the aggravator beyond a reasonable doubt. See Farina v. State, 801 So.2d 44, 54 (Fla.2001). We have held that the following evidence is also pertinent when reviewing this aggravator: "[W]hether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant." Id. The evidence in this case indicates that Nelson probably could have accomplished the burglary of Brace's home and sexual battery without killing her since Brace likely posed little physical resistance to Nelson: she was 78 years old; she was awakened from her bed in the middle of the night when she was wearing only a nightgown; and at that time her eyeglasses and hearing aids were on her night stand. Further, Nelson easily obtained access to her car. Therefore, it appears that once Nelson immobilized Brace by putting her in the trunk, he secured an uncontested getaway and there was no reason for him to kill her except to eliminate her as a witness. See Looney v. State, 803 So.2d 656, 677-78 (Fla.2001) (finding that once the defendants immobilized the victims, gained access to the victims' property and vehicles, and secured an uncontested getaway, the only remaining reason to kill the victims was to eliminate them as witnesses), cert. denied, 536 U.S. 966, 122 S.Ct. 2678, 153 L.Ed.2d 850 (2002).
Nelson's act of taking Brace to a remote area to kill her also lends support to the finding of the avoid arrest aggravator in this case. The evidence at trial was that Nelson drove to an isolated orange grove to kill Brace, but his plan was stymied when the car became stuck in the sand and he needed the assistance of other people to extricate the car. Nelson then drove to another orange grove where he killed Brace. The record reflects that Nelson's journey to two different orange groves was intended to find an isolated place to kill Brace, the sole witness to his crimes. See Knight v. State, 746 So.2d 423, 435 (Fla. 1998); Preston v. State, 607 So.2d 404, 409 (Fla.1992); Cave v. State, 476 So.2d 180, 188 (Fla.1985); Martin v. State, 420 So.2d 583, 585 n. 3 (Fla.1982).
We find no error in the trial court's finding of the avoid arrest aggravator because the defendant's own statements and actions corroborate evidence that the sole or dominant murder motive in this case was to silence Brace as the sole witness against him.

*527 COLD, CALCULATED, AND PREMEDITATED AGGRAVATOR
Nelson claims that the trial court's finding of the cold, calculated, and premeditated aggravator (CCP) was contrary to the evidence because, he asserts, the evidence established that he killed Brace in a rage or panic, negating the elements necessary to prove CCP. In the sentencing order, the trial court referred to Nelson's admission to police that he would have killed Brace at the first orange grove except that the car became stuck in sand. The trial court stated that heightened premeditation was further demonstrated by the evidence that Nelson drove to another orange grove and walked or dragged Brace to the place where he killed her and he made two trips back to the car to get weapons.
We find that regardless of whether Nelson intended to kill Brace at the time he entered her house, his act of driving around with the victim in the trunk for several hours and taking her to two remote locations before killing her indicates that, at the least, he conceived the plan to kill her during that extended period.[9]See Knight v. State, 746 So.2d 423, 436 (Fla. 1998) (finding that "[e]ven if Knight did not make the final decision to execute the two victims until sometime during his lengthy journey to his final destination, that journey provided an abundance of time for Knight to coldly and calmly decide to kill"); see also Connor v. State, 803 So.2d 598, 611 (Fla.2001) (affirming CCP where the trial court's finding included the fact that Connor hid victim for one whole day before killing her), cert. denied, 535 U.S. 1103, 122 S.Ct. 2308, 152 L.Ed.2d 1063 (2002).
The mental mitigation evidence Nelson presented did little to impact the finding of the CCP aggravator. For example, the defense mental health expert, Dr. Dee, testified that Nelson told him that he was seeing things on the day of the murder; however, Nelson did not tell him that he was hearing things on the day of the murder. Additionally, Nelson told police that after he kidnapped Brace and it was still dark outside, he deliberately stopped to get gas. Similarly, Dr. Dee testified that Nelson related to him that while driving around with Brace in the trunk, Nelson stopped and bought himself a cup of coffee. As evaluated by the trial court, Dr. Dee's testimony that Nelson was prone to being impulsive and that he was angry and scared during the time period of the murder is simply not consistent with the actions of someone who drove around for hours with a live person in the trunk, even stopping during that time to get gas and coffee.
The persistent and somewhat time-consuming manner in which Nelson killed Brace with makeshift weapons at the orange grove also appears to support a finding of CCP. The trial court cited Willacy v. State, 696 So.2d 693 (Fla.1997), to support its finding that the two trips Nelson made to the car (a distance of 175 feet one way) so that he could obtain additional weapons with which to kill her indicated CCP.[10] In the instant case, there was evidence *528 that Nelson used multiple means to try to kill Brace. The trial court properly found that the type of repeated effort to kill Brace supported a finding of CCP. See Ford v. State, 802 So.2d 1121, 1133 (Fla. 2001) (holding that CCP was supported by the facts that in the course of events, Ford had to stop to reload his rifle and that during the course of the murders, Ford assaulted the victims with three different weapons: a gun, a blunt instrument such as an ax, and a knife), cert. denied, 535 U.S. 1103, 122 S.Ct. 2308, 152 L.Ed.2d 1063 (2002).

DOUBLING
We also conclude there was not an improper doubling of aggravators regarding the trial court's finding that both the avoid arrest aggravator and CCP existed. In the case at bar, the State properly established that Nelson's motive for killing Brace was to eliminate her as the sole witness to burglary and sexual battery, i.e., Nelson admitted that he killed her so that she could not call the police and identify him; he subdued her by putting her in the trunk after the initial crimes were committed; he took her to a remote location to kill her. Further, the State properly proved that the manner in which Brace was killed resulted from a heightened premeditation, i.e., Nelson drove around with the victim in the trunk for several hours before killing her; when his initial plan was foiled he took her to another location; it took several attempts before Nelson succeeded in killing her. Therefore, the avoid arrest aggravator and CCP were considered as separate aspects of the crime and were supported by distinct facts in this case. See Stein v. State, 632 So.2d 1361, 1366 (Fla.1994) (holding that a trial court can properly find both the avoid arrest aggravator and CCP in the same case, "[s]o long as each aggravator is supported by such distinct facts"); see also Gore v. State, 706 So.2d 1328, 1334 (Fla.1997).

AGE MITIGATOR
Nelson claims that the trial court failed to consider and to properly weigh the statutory and nonstatutory mitigating circumstances presented during the penalty phase. We address each of the claimed mitigators in turn.
The trial court found that the defendant's age at the time of the murder, 21, was not a mitigating factor. In the case at bar, the trial court did not make a qualitative statement that referred to Nelson as "mature" or "independent," but its brief finding of facts and citation to Kokal v. State, 492 So.2d 1317, 1319 (Fla.1986) (defendant was 21 years of age and immature), appear to indicate a finding that Nelson was a capable and self-sufficient adult at the time of the murder. In the sentencing order, the trial court stated that the age mitigator was not found because there was evidence that Nelson had voluntarily dropped out of high school after ninth grade, spent a year in the Job Corps in Kentucky, served time in prison, and was living on his own.
In Shellito v. State, 701 So.2d 837 (Fla.1997), we held: "[W]henever a murder is committed by a minor, the mitigating factor of age must be found and weighed but that the weight can be diminished by other evidence showing unusual maturity." Id. at 843. However, where the defendant is not a minor, as in the instant case, "no per se rule exists which pinpoints a particular age as an automatic factor in mitigation." Id. The existence and weight to be given to this mitigator *529 depends on the evidence presented at trial and the sentencing hearing. See id. For example, this Court has held that age twenty, in and of itself, does not require a finding of the age mitigator. See Garcia v. State, 492 So.2d 360, 367 (Fla.1986).
In Gudinas v. State, 693 So.2d 953 (Fla. 1997), we held, "Although Gudinas is certainly correct that he had a troubling past and had always been small for his age, there was no evidence presented that he was unable to take responsibility for his acts and appreciate the consequences thereof at the time of the murders." Id. at 967. In that case, we found that there was substantial, competent evidence in the record to support the trial court's finding "that Gudinas was mentally and emotionally mature enough that his age should not be considered as a mitigator." Id.
The record herein supports the trial court's rejection of this mitigator because there was additional evidence of Nelson's functioning as a mature adult: he obtained and temporarily held a job; he provided his child's mother with money to buy necessities when she was visiting; Nelson did not have a home of his own, but arranged to stay with Leila Eiland, Juldy Bolton, or Reagis Ishmael; and Nelson did not have a driver's license or a car, yet was able to travel places on his own. See Hurst v. State, 819 So.2d 689, 698 (Fla.2002) (holding that the evidence did not support a finding that a non-minor suffered from mental and emotional problems sufficient to warrant age as a mitigator and noting that Hurst owned his own car, performed adequately in school, and helped with child care within his family).
The defense mental health expert, Dr. Dee, testified that Nelson had an IQ of 79, that he had memory impairment, and that his higher mental abilities were grossly affected. However, there was no additional testimony that Nelson was "immature" for someone his age, or that his emotional age was less than his chronological age. See, e.g., Mahn v. State, 714 So.2d 391, 400 (Fla.1998) (holding that age was a mitigating circumstance where defendant's long history of substance abuse, mental and emotional instability, and passivity in the face of mental and physical abuse provided the essential link between defendant's age and immaturity); Campbell v. State, 679 So.2d 720, 725-26 (Fla.1996) (finding that the trial court erred in not giving requested jury instruction on age as a mitigating circumstance when a psychological expert testified that although the defendant was 21, his emotional age was "somewhere in the adolescent range").

EXTREME DISTURBANCE MITIGATOR
The trial court also concluded that the extreme mental or emotional disturbance mitigator was not proven. In the sentencing order, the trial court found the mental health expert's testimony on this issue not to be credible, and to be inconsistent with other, more credible, evidence.
This Court has defined the circumstances under which a trial court may reject a mitigator:
Whenever a reasonable quantum of competent, uncontroverted evidence of mitigation has been presented, the trial court must find that the mitigating circumstance has been proved. A trial court may reject a defendant's claim that a mitigating circumstance has been proved if the record contains competent substantial evidence to support the trial court's rejection of the mitigating circumstance.
Spencer v. State, 645 So.2d 377, 385 (Fla. 1994) (citation omitted).
*530 We considered the issue of expert opinion testimony in Walls v. State, 641 So.2d 381 (Fla.1994), stating:
Walls contends that the trial court improperly rejected expert opinion testimony that he was suffering extreme emotional disturbance and that his capacity to conform his conduct to the law's requirements was substantially impaired. In Florida as in many states, a distinction exists between factual evidence or testimony, and opinion testimony....
... Certain kinds of opinion testimony clearly are admissibleand especially qualified expert opinion testimonybut they are not necessarily binding even if uncontroverted. Opinion testimony gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking. A debatable link between fact and opinion relevant to a mitigating factor usually means, at most, that a question exists for judge and jury to resolve.
Id. at 390-91 (citations omitted). Thus, the trial court was entitled to evaluate and disregard Dr. Dee's opinion if the trial court felt that the opinion was unsupported by facts. The testimony that Nelson was "seeing things" on the day of the murder, that he suffered from hallucinations, and that he suffered from depression for many years provided perhaps the most relevant evidence to support this mitigator. However, the record reflects that the source of this evidence was largely Nelson's self-reports to Dr. Dee, and that the trial court basically rejected Dr. Dee's uncontroverted expert opinion.
As the trial court stated, several witnesses who encountered Nelson before and after the murder testified that he was acting normally. The defendant's cousin, Calvin Fogle, testified that on the evening before the murder, Nelson did not appear unusual. The defendant's girlfriend, Reagis Ishmael, testified that on the evening before the murder, nothing seemed to be unusual or out of the ordinary about Nelson. Nelson's cousin, Andy Eiland, testified that he spent time with Nelson on the day before the murder from noon until 10:30 p.m. Eiland stated he observed Nelson drink one beer that evening, Nelson acted "normal," and he did not notice anything out of the ordinary. Nelson's sister and brother-in-law, Juldy Bolton and Willy Bolton, testified that when they spent the evening with Nelson on the same day the murder occurred (after the murder), everything seemed normal. Nelson came over to their house, ate dinner, and played cards with the two of them. Thus, the evidence as it unfolded at trial supported the trial court's analysis and indicated that the crimes Nelson committed were unexpected and uncharacteristic of his behavior around that time.
Nelson argues that the trial court made "misstatements" in the sentencing order regarding the extreme mental or emotional disturbance mitigator. However, even if the trial court did misstate some mitigation testimony, we find the misstatements not so substantial as to undermine the trial court's conclusion that this mitigator was not established by the greater weight of the evidence. See Bryant v. State, 785 So.2d 422, 431 (Fla.2001). The record reflects that there was competent, substantial evidence refuting the allegation that Nelson was under extreme mental or emotional disturbance.

OTHER STATUTORY MITIGATION
The trial court also found that the mitigator that Nelson's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired was not *531 proven.[11] The trial court referred to Nelson's calculated but suspicious actions, as observed by witness Steven Weir, when Nelson got the car stuck in the sand. The trial court noted that once the car was extricated, Nelson deliberately drove to another grove and took the victim 175 feet into the grove before killing her. The trial court held: "This indicates that his capacity to appreciate the criminality of his act was not substantially impaired. He knew that his conduct was criminal and he took logical steps to conceal his actions from others."
Further, there was competent, substantial evidence refuting the allegation that Nelson lacked the capacity to appreciate the criminality of his acts and to conform to the requirements of law due to brain damage. As we discussed previously, the trial court was entitled to reject Dr. Dee's opinion that Nelson suffered from brain damage if it found that the facts in the case did not support the expert opinion. See Walls, 641 So.2d at 390-91.[12] Further, there was no documentation that Nelson actually suffered fetal alcohol syndrome or that he ever incurred a head injury. Evidence was presented that Nelson knew his actions were wrong. In addition to the examples cited by the trial court (Nelson's removing the victim from her house and taking her to an orange grove, concealing her presence in the trunk from the heavy equipment operator who helped him out of the sand, driving to a second orange grove, and taking the victim 175 feet into the grove), other evidence was presented at trial: Nelson replaced the screen on the outside where he climbed into Brace's home; he lied to Deputy Pope and the Avon Park police about the car being loaned to him by Brace, whom he characterized as a family friend; and he made up a fake phone number for Brace when the police asked him for her number. These purposeful actions are indicative of someone who knew those acts were wrong and who could conform his conduct to the law if he so desired. See Provenzano v. State, 497 So.2d 1177, 1184 (Fla.1986) (stating that Provenzano's actions on the day of the murder did not support the mitigator that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired because he concealed the weapons he carried, he put change in the parking meter, and took his knapsack out to his car instead of allowing it to be searched because it would have exposed his illegal possession of weapons).
Therefore, we affirm the trial court's evaluation and rejection of the three statutory mitigators discussed above.

*532 NONSTATUTORY MITIGATORS
The trial court found that six of the twenty-one nonstatutory mitigators claimed by Nelson were not proven. Several of those mitigators were closely tied to the statutory mitigators and some of them were closely tied to each other. They are: (a) Nelson's good judgment was impaired (trial court found that brain damage evidence had already been rejected and mitigator was contrary to evidence); (b) Nelson was remorseful for his conduct (trial court found that there was "little in the record to indicate remorse"); (c) Nelson did not plan to commit the offense in advance (trial court found this is refuted by CCP aggravator being present); (d) Nelson had a troubled and neglected childhood (trial court found that "there is nothing in the record (except for one incident involving sex with his sister) that would indicate a trouble [sic] or neglected childhood"); (e) Nelson had organic brain damage (trial court stated that it previously rejected this claim); and (f) Nelson has accepted responsibility for his action (trial court stated that there was nothing in the record except Nelson's cooperation with the police, which was previously considered, to show this).
The trial court briefly addressed these mitigators in the sentencing order. The trial court determined that these mitigating factors were not supported by the evidence. This is a proper threshold determination, according to this Court's holding in Campbell v. State, 571 So.2d 415 (Fla.1990): "When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence...." Id. at 419 (footnote omitted). In Bryant v. State, 785 So.2d 422 (Fla.2001), this Court upheld the trial court's succinct rejection of mitigating factors in the sentencing order, stating: "The sentencing order expressly identified this mitigating factor and, while it was discussed only briefly, it is clear the court found the mitigation was not proven by the greater weight of the evidence due to the conflicting testimony." Id. at 433. As in Bryant, the trial court in this case cited to specific record evidence regarding each mitigator that it found was not supported by the evidence.
We find no merit in Nelson's argument that the trial court did not give enough weight to the remaining fifteen mitigators. In Trease v. State, 768 So.2d 1050 (Fla. 2000), we reiterated well-settled law that "[t]he relative weight given each mitigating factor is within the discretion of the sentencing court." Id. at 1055. The trial court in this case gave at least "very little weight" to the mitigators that it found existed.
Accordingly we affirm the trial court's findings regarding the nonstatutory mitigators because the trial court did not abuse its discretion when it found that certain mitigators were not proven and when it assigned varying degrees of weight to the mitigators that were proven.

PROPORTIONALITY
Nelson claims that the imposition of a death sentence in this case is disproportionate. Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). This Court reviews and considers all the circumstances in a case relative to other capital cases when deciding whether death is a proportionate penalty and to ensure uniformity. See Johnson v. State, 720 So.2d 232, 238 (Fla.1998); Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). The death penalty is reserved only for those *533 cases where the most aggravating and least mitigating circumstances exist. See Kramer v. State, 619 So.2d 274, 278 (Fla. 1993).
We find that the death penalty was not a disproportionate sentence in this extremely aggravated case, as compared to other similar cases that this Court has decided. Importantly, the trial court found that the HAC and CCP aggravators were present in this case, and this Court has previously held that they "are two of the most serious aggravators set out in the statutory sentencing scheme, and, while their absence is not controlling, it is also not without some relevance to a proportionality analysis." Larkins v. State, 739 So.2d 90, 95 (Fla. 1999).
In Bowles v. State, 804 So.2d 1173 (Fla. 2001), this Court affirmed death as a sentence when the aggravators were: (1) prior conviction of two violent felonies; (2) defendant was on felony probation when the murder was committed; (3) the murder was committed during a robbery and for pecuniary gain (merged); (4) HAC; and (5) CCP. See id. at 1175. The trial court in that case rejected the statutory mitigators of extreme emotional disturbance and the defendant's diminished capacity to appreciate the criminality of his acts at the time of the murder. See id. at 1176. The trial court assigned weight to the following mitigating factors: (1) abusive childhood (significant weight); (2) defendant's history of alcoholism (some weight); (3) defendant's lack of a father figure (some weight); (4) defendant's lack of education (little weight); (5) defendant's guilty plea and cooperation with police (little weight); (6) defendant's use of intoxicants at the time of the murder (little weight); and (7) the circumstances which caused Bowles to leave home or his circumstances after he left home (no weight). See id.
In Connor v. State, 803 So.2d 598 (Fla. 2001), this Court affirmed the death sentence, even in light of the avoid arrest aggravator being stricken. See id. at 612. In that case, the remaining aggravators were: (1) CCP; (2) HAC; (3) murder committed while engaged in a kidnapping; and (4) previous capital felony. See id. at 604. The trial court did not find any statutory mitigators in that case, but it did find four nonstatutory mitigators: (1) defendant suffered from a mental illness at the time of the crime; (2) defendant was a good father; (3) defendant would die in prison if given a life sentence; and (4) defendant had no disciplinary problems in prison. See id.
Based on the totality of the circumstances in this case considered in light of this Court's prior decisions in other capital cases involving similar circumstances, we find that death is a proportionate penalty in this case.

CONSTITUTIONALITY OF FLORIDA DEATH PENALTY SCHEME
On rehearing, Nelson has asserted that Florida's capital sentencing scheme violates the United States Constitution under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed a similar contention in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. We find that Nelson is likewise not entitled to relief on this claim.
Accordingly, we affirm Nelson's convictions and sentences.
It is so ordered.
*534 WELLS, PARIENTE, LEWIS, and QUINCE, JJ., and SHAW, Senior Justice, concur.
PARIENTE, J., concurs specially with an opinion.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
PARIENTE, J., specially concurring.
I concur in the affirmance of Nelson's convictions and death sentence. I write separately because in my view this Court's opinions in Bottoson and King, which involved successive postconviction claims, do not answer why Nelson's Ring claim should be rejected in this direct appeal.
In the guilt phase of trial, the jury found Nelson guilty of sexual battery, burglary, and kidnapping, in addition to first-degree murder. These offenses were charged and tried together with the murder count as "related" offenses. See Fla. R.Crim. P. 3.152(a)(2). The trial court found, in its order sentencing Nelson to death, that the murder was committed in the course of, or during flight after commission of, one or more of these additional offenses.
In Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Referring to its holding in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), that the failure to allege prior convictions in an indictment did not preclude sentence enhancement, the Court in Apprendi stated:
Both the certainty that procedural safeguards attached to any "fact" of prior conviction, and the reality that Almendarez-Torres did not challenge the accuracy of that "fact" in his case, mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a "fact" increasing punishment beyond the maximum of the statutory range.
530 U.S. at 488, 120 S.Ct. 2348. In Ring, the Court extended Apprendi to capital sentencing.
I conclude that the Almendarez-Torres exception to Apprendi and Ring applies in this case. Like the enhancing factor of the prior convictions in Almendarez-Torres, the aggravator of commission of the murder in the course of a felony in this case has the procedural safeguards of a unanimous verdict of guilt on the separate offenses of sexual battery, burglary, and kidnapping, and the fact that the jury found the defendant guilty of these offenses and first-degree murder based on evidence of a single criminal episode concluding in the victim's death.[13] Additionally, Nelson has not asserted that the murder did not occur in the course of, or during flight after, commission of one or more of these offenses. Therefore, I believe that the Almendarez-Torres exception to Apprendi applies, and Nelson's sentence does not violate the Sixth Amendment to the United States Constitution.[14]
*535 Further, because a unanimous jury found Nelson guilty of the offenses relied on for the aggravator of murder in the course of a felony, specifically, sexual battery, burglary, and kidnapping, I conclude that a death sentence based on a nine-to-three death recommendation does not violate the requirement of unanimity of jury verdicts. See Butler v. State, 842 So.2d 817, 835 (Fla.2003) (Pariente, J., concurring in part and dissenting in part). In my view, the guilty verdicts on these separate offenses satisfy the requirement of jury unanimity for any fact necessary to render a defendant eligible for the death penalty.
ANSTEAD, C.J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects except for its discussion of the Ring issue. The majority opinion repeats the assertion that the plurality opinions in Bottoson v. Moore, 833 So.2d 693 (Fla. 2002), and King v. Moore, 831 So.2d 143 (Fla.2002), provide a basis to reject Ring claims despite the lack of a clear majority in either case. Moreover, for the reasons I expressed in my opinion in Duest v. State, No. SC00-2366, ___ So.2d ___, 2003 WL 21467248 (Fla. June 26, 2003), I cannot agree with the reasoning in Justice Pariente's separate opinion, which concludes that a Ring claim may be rejected because one of the six aggravating circumstances that the trial judge found was that the murder was committed in the course of enumerated felonies. Even if we were to view one aggravating circumstance as "exempt" from the dictates of Ring, four of the five remaining aggravating circumstances that the judge found alone were given great weight in imposing the death penalty.[15] Hence, such findings and reliance thereon would appear to violate the mandate of Ring that a death sentence may not be based upon findings made by the trial court alone.
NOTES
[1] The medical examiner testified that the soles of Brace's feet were dirty, indicating that "she probably left standing on her feet," but that there was also evidence that she had been dragged on her back.
[2] An emptied fire extinguisher was recovered on the rear floor of the driver's seat of Brace's car. A yellow powdery substance from the extinguisher's contents was located around the hose. The yellow powder was also found on the rear floorboard behind the driver's seat, in the trunk, and on Brace's face and in her bronchial tubes.
[3] The three statutory mitigating factors addressed by the trial court were: (1) age of the defendant at the time of the offense (twenty-one years old) (not proven); (2) the defendant was under extreme mental or emotional disturbance at the time of the offense (not proven); and (3) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (not proven).
[4] See supra pp. 518-20.
[5] See Roman v. State, 475 So.2d 1228, 1232-33 (Fla.1985) (characterizing the "Christian burial technique" as being "a blatantly coercive and deceptive ploy").
[6] The evidence at trial was that under the "pro" column, the police listed things such as "being honest" and "cooperation." In the "known evidence/con" column, the police listed things including, "perjury under oath (lied during sworn statements)," "denied being in victims [sic] home (your finger prints were located inside victims [sic] home)," and "failed polygraph."
[7] Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992) (finding that the HAC jury instruction given in that case was impermissibly vague).
[8] In Alston, this Court upheld the trial court's finding of the avoid arrest aggravator. 723 So.2d at 160. The trial court found:

The defendant and his accomplice took James Coon ... to a part of town after taking personal property from him, and thereafter executed him because the defendant realized that James Coon could identify him and his accomplice. The purpose of the killing was to eliminate a witness to the kidnapping and robbery.
Id.
[9] The evidence at trial was that Brace was alive as late as 9:30 a.m. on November 17, 1997, when Steven Weir felt a bump on the trunk of the car.
[10] In Willacy, this Court supported the trial court's CCP finding, stating:

After Willacy bludgeoned and bound Sather, he choked and strangled her. Because Sather would not die, Willacy moved her into another room; obtained a can of gasoline from the garage; retrieved a fan from another room; disabled the three smoke detectors in the house; doused Sather with gasoline; set her on fire; and trained the fan on her to feed the flames.
Id. at 696.
[11] We note that the trial court referred to this mitigator in the sentencing order as "Capacity to appreciate the criminality of his acts and to conform to the requirements of law." Although this phrasing represents a slight misstatement from the statutory mitigator set forth in section 921.142(7)(e), Florida Statutes (1997), we conclude that the trial court's phrasing of the mitigator is harmless as the analysis in the sentencing order is equally valid regarding the proper statutory term.
[12] In the sentencing order, the trial court questioned whether Dr. Dee's testimony met the Frye standard. See Frye v. U.S., 293 F. 1013 (D.C.Cir.1923). Such a query was not appropriate in light of the fact that there was no Frye challenge regarding Dr. Dee's testimony in this case. See Hadden v. State, 690 So.2d 573, 580 (Fla.1997). However, we treat the trial court's Frye test statement as harmless dicta because it appears that the comment was meant as a finding regarding Dr. Dee's credibility, not as an actual ruling regarding the Frye standard.

Additionally, we note the trial court's statement in the sentencing order, "Brain damage is becoming a popular argument in capital cases." Though this statement also represents harmless, superfluous dicta, we admonish trial courts against injecting this type of opinion comment into capital proceedings.
[13] Because the jury found Nelson guilty of first-degree murder on a general verdict form and the evidence is sufficient to establish premeditated murder, the concerns expressed by Justice Anstead as to use of the "murder in the course of a felony" aggravator in a case in which the defendant is guilty only of felony murder are not present here. See Blanco v. State, 706 So.2d 7, 12-13 (Fla.1997) (Anstead, J., specially concurring).
[14] The separate aggravator that Nelson was previously convicted of a felony and was under a sentence of imprisonment and on felony probation or controlled release at the time of the killing does not have the same procedural safeguards. There is no jury finding of Nelson's incarcerative or probationary status at the time of the murder, akin to the verdicts of guilt on the separate offenses tried in the same proceeding as the murder count, which supports the "murder in the course of a felony" aggravator. However, the "murder in the course of a felony" aggravator alone is sufficient to satisfy the Sixth Amendment in this case, pursuant to Apprendi.
[15] As the majority expressly states, it was the trial court, not the jury, that found the six statutory aggravators in this case: (1) the defendant was previously convicted of a felony, was under a sentence of imprisonment, and was on felony probation, or controlled release, at the time of the murder; (2) the crime for which the defendant was to be sentenced was committed while the defendant was engaged in the commission of, or flight after, committing a sexual battery, burglary, or kidnapping; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (4) the murder was especially heinous, atrocious or cruel; (5) the murder was committed in a cold and calculated and premeditated manner, and without any pretense of moral or legal justification; and (6) the victim was particularly vulnerable due to advanced age or disability.