901 So.2d 241 (2005)
Billy Jones COTTON, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D03-1629.
District Court of Appeal of Florida, Third District.
April 20, 2005.
Rehearing Denied June 3, 2005.
*242 Bennett H. Brummer, Public Defender and Robert Kalter, Assistant Public Defender, for appellant.
Charles J. Crist, Jr., Attorney General and Jennifer Falcone Moore, Assistant Attorney General, for appellee.
Before GREEN, RAMIREZ, and WELLS, JJ.
*243 GREEN, J.
Billy Jones Cotton appeals his conviction and sentence for first-degree murder, armed robbery and burglary of an occupied conveyance after a jury trial. His sole contention on appeal is that the trial court erred in denying his motion to suppress several statements given to the police without the benefit of Miranda[1] warnings. We affirm based upon our conclusion that the statements sought to be suppressed were not the product of a custodial interrogation.
The evidence developed at the suppression hearing, which we must interpret in a manner most favorable to sustaining the trial court's ruling,[2] is as follows. On October 14, 1999, at approximately 11:00 a.m., a United Parcel Service driver was shot and killed in the back of his truck while making a delivery at E.R.P. Export's warehouse. The perpetrators took the driver's Rolex watch and fled the scene. A warehouse employee gave the police a description and the tag number of the getaway vehicle. The police put out a BOLO for this vehicle.
The vehicle was spotted a short time later, parked and unoccupied. The police set up a surveillance. At approximately 2:00 p.m. that same day, the police observed Cotton and co-defendant Ronnie Owens approach and attempt to enter the vehicle. Cotton and Owens were detained by the police until the witness from the warehouse could be brought over to identify them.
When the witness arrived at the scene of the vehicle, Cotton and Owens were standing in a grassy area next to a parking lot, along with other civilians in the area. The witness was unable to identify either Cotton or Owens as the perpetrators of the murder, but he identified Cotton as someone who worked with him at E.R.P. Export. Thus, at this point, there was no evidence that either Cotton or Owens was involved in the robbery and murder.
The police then told Cotton that they had information that the car matched the description and tag number of a car that was involved in a homicide that morning at another location. In response, Cotton told the police that the car had been at this same location all morning and that neither he, Owens, nor the car was involved in a crime. The police testified that at this point they had no reason to dispute Cotton's assertion because they had no evidence linking him to the crime. The police then asked Cotton if he was willing to come to the police department to give a statement to the effect that the vehicle had been at the same location all morning and that neither he nor Owens had been inside the vehicle. Both Cotton and Owens agreed to go to the police station to give statements as to the car's location. They were allowed to travel together to the station and were not handcuffed. The police similarly asked other warehouse employees to go to the station to give statements.
While at the station, Cotton was treated in the same manner as all of the other witnesses. He was not handcuffed or otherwise physically restrained. He and the other witnesses were permitted to get a drink, go to the bathroom, go for a walk, or anything else that they wanted to do, albeit with an escort. The police explained that police department policy did not permit anyone, including family members, victims, *244 or witnesses to be unescorted on the second floor. Cotton and the other witnesses were interviewed separately over the course of approximately nine hours. The lead detective testified that this was not unusual, and that witnesses in homicide cases frequently wait long periods of time to give a statement. Additionally, Cotton and the other witnesses were not told that they were free to leave because the detective testified that it was not his usual practice to do so.
During the course of the evening, Cotton was interviewed on three separate occasions. He was never Mirandized prior to any of these interviews. The police testified that it was clear to them that Cotton was not involved in the murder or robbery and was only a witness.
The first interview occurred at 7:05 p.m. and lasted until 7:45 p.m. The interview was conducted by Detective John Allickson who was accompanied by Detective Garcia. During this interview, Cotton denied any knowledge of the robbery. Detective Allickson then asked Cotton if he would wait to be questioned again after the police spoke with Owens some more. Cotton was then escorted to the computer room to wait; Detective Rodriguez was assigned to watch him. While waiting there, Cotton conversed with Detective Rodriguez. At some point in this conversation, Cotton told Detective Rodriguez that he had not been truthful with the other detectives and that he did know something about the robbery. Detective Rodriguez then left the computer room to inform the other detectives.
Detective Allickson returned for a second interview with Cotton at approximately 10:55 p.m. During this interview, which lasted approximately five minutes, Cotton told the police in a written statement that he had observed Owens and another co-defendant, Barry McIntosh, leave together in the subject car to commit a robbery, but that he did not go with them. He also said that he was present when they returned, but repeated that he was not involved.
At 11:59 p.m., Cotton gave a sworn taped statement to Detectives Garcia and Rodriguez. Cotton was informed by the police that he was a witness and not a suspect in the case. During this statement, Cotton identified co-defendant, McIntosh, from a photograph as the person involved in the robbery. He further agreed to take the detectives to various places where McIntosh might be found. Cotton directed the police to McIntosh's girlfriend, who, in turn, told the police where to find McIntosh.
After Cotton assisted the police in locating McIntosh, the police, at Cotton's request, dropped Cotton off in the general vicinity of his home. Cotton did not want to be dropped off in front of his home because he did not want to be seen exiting a police vehicle.
The evidence adduced at the suppression hearing further reveals that from that point until two years later, the police only considered Cotton to be a witness. Indeed, Cotton did not become a suspect in the crime until two years later when Owens voluntarily gave the police a statement inculpating Cotton as the mastermind behind the robbery. Owens admitted to driving the get-away car and identified McIntosh as the robber/murderer.
At the suppression hearing, Cotton argued that all of his statements to the police during the three interviews should be suppressed because he was in custody at the time that they were made and he had not been given Miranda warnings. In support of his argument, he stated that he was with the police from 2:00 p.m. until 11:00 p.m.; escorted throughout the police department; and never told that he was *245 free to leave. Under the totality of these circumstances, he argued that a reasonable person would not have felt free to leave and that he was therefore in custody for purposes of Miranda.
At the conclusion of the hearing, the trial court denied the motion to suppress. The court found the officers' testimony to be credible and found that the defendant was not in custody at the time he made the challenged statements. Therefore, the court concluded that Miranda warnings were unnecessary. The case proceeded to trial and the jury returned guilty verdicts on each of the charged offenses. Cotton was sentenced to three concurrent life sentences.
On appeal, Cotton asserts that his statements to the police should have been suppressed because they were taken in violation of both the fourth and fifth amendments. We disagree.
The Florida Supreme Court has articulated our standard of review for orders on motions to suppress as follows:
[A]ppellate courts should continue to accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.
Nelson v. State, 850 So.2d 514, 521 (Fla.2003)(quoting Connor v. State, 803 So.2d 598, 608 (Fla.2001)). Cotton first asserts that he was illegally detained in violation of the fourth amendment when the police initially approached him as he was attempting to enter the get-away car and when the police detained him until the eyewitness was brought over for a show up. We note initially that this fourth amendment argument was not preserved for appellate review because it was not raised as part of the suppression motion below. See State v. Cornuz, 816 So.2d 827 (Fla. 3d DCA 2002); State v. Taylor, 826 So.2d 399 (Fla. 3d DCA 2002). Even if it had been preserved, it would not have been meritorious. Cotton was initially stopped and detained by the police as he approached and tried to enter a car that had been identified as the get-away car for a homicide and robbery. This was sufficient to give the police reasonable suspicion to conduct an investigatory stop of Cotton. See State v. Gonzalez, 682 So.2d 1168, (Fla. 3d DCA 1996); see also State v. Clark, 721 So.2d 1202 (Fla. 3d DCA 1998)(citizen information need not be independently verified).
We therefore direct our attention solely to Cotton's fifth amendment challenge to his statements given to police without Miranda warnings. The need for Miranda warnings is only triggered where a person is questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 86 S.Ct. 1602; Fitzpatrick v. State, 900 So.2d 495 (Fla. 2005); Cillo v. State, 849 So.2d 353 (Fla. 2d DCA 2003); Duddles v. State, 845 So.2d 939 (Fla. 5th DCA 2003). The Florida Supreme Court has said that "under the dictates of Miranda a suspect involved in a custodial interrogation by law enforcement officials is entitled to the procedural safeguards of the Miranda warning, `the key being that the suspect must be in custody.'" Fitzpatrick, 900 So.2d at 510 (quoting Correll v. State, 523 So.2d 562, 564 (Fla.1988)). "In determining whether a suspect is in custody, `the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the *246 degree associated with a formal arrest.'" Id. (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). This inquiry is approached from the perspective of how a reasonable person would have perceived the situation. Id. Where, however, a suspect is not placed under arrest, voluntarily goes to the police station, and is allowed to leave unhindered by police after a brief interview, Miranda warnings are not required. Id. (citing California v. Beheler, 463 U.S. 1121, 1121-22, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)). "Miranda warnings are not required `simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" Id. (quoting Mathiason, 429 U.S. at 495, 97 S.Ct. 711).
Based upon our independent review of the record evidence adduced below, we agree with the trial court's conclusion that Miranda warnings were not necessary in this case because Cotton was not subject to custodial interrogation when he made his statements to the police. We do not believe that a reasonable person in Cotton's position would have perceived that he or she was under a formal arrest or that there was a restraint on his or her movement during the times that the statements were made. See Connor, 803 So.2d at 605.
The record evidence supports the trial court's conclusion that Cotton voluntarily agreed to go to the police station to give his statement as a witness. Not only was he told by the police that he was just a witness, but he was treated by the police at all times like the other witnesses who went to the police station. The actions by the police in this case never explicitly or implicitly suggested that Cotton was in custody. See Roman v. State, 475 So.2d 1228, 1231 (Fla.1985)("a reasonable person might be more likely to think he is not in custody if specifically told he is not under arrest."). Cotton was never confronted by the police with any evidence of his guilt during the course of the interviews. Under the totality of the circumstances, the fact that he was with the police for approximately nine hours and never told that he was free to leave did not elevate this otherwise consensual encounter into a formal arrest. See Roman, 475 So.2d at 1231. There were periods of delay between his interviews because the lead detective was simultaneously interviewing the other witnesses. Moreover, the police informed Cotton that he was just a witness, and he was not under arrest. While a reasonable person may feel inconvenienced by these delays, we don't believe that a reasonable person would feel that he or she was under arrest.
Thus, for all of the foregoing reasons, we affirm the order denying the motion to suppress.
Affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] See Connor v. State, 803 So.2d 598, 605 (Fla.2001)(citing Murray v. State, 692 So.2d 157, 158 (Fla.1997)); State v. Gelin, 844 So.2d 659, 660 (Fla. 3d DCA 2003).