# Supreme Court of Florida

_____

No. SC15-801
_____

**STATE OF FLORIDA,**
Petitioner,

vs.

**CHRISTOPHER MARKUS,**
Respondent.

[January 31, 2017]

LEWIS, J.

This case is before the Court to review the decision of the First District Court of Appeal in Markus v. State, 160 So. 3d 488 (Fla. 1st DCA 2015). This case concerns a warrantless home entry along with a search and seizure and a motion to suppress material seized by law enforcement. The issue we must address today is whether the exigent circumstance exception of hot pursuit justifies a warrantless home entry, search, and arrest when the underlying conduct for which there is probable cause is only a nonviolent misdemeanor and the evidence of the alleged misdemeanor is outside the home. The dissent prefers to distort the facts to support the government invasion into the home, but our analysis must rely

on the actual facts, not a predetermined outcome. The State asserts that the decision of the First District Court of Appeal expressly and directly conflicts with Ulysse v. State, 899 So. 2d 1233 (Fla. 3d DCA 2005). We conclude that conflict exists between these decisions. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. The totality of the circumstances must be taken into account in evaluating Fourth Amendment cases, and we hold that a warrantless home entry, accompanied by a search, seizure, and arrest is not justified by hot pursuit when the underlying conduct for which there is alleged probable cause is a nonviolent misdemeanor and the evidence related thereto is outside the home. There is no destruction of evidence issue involved here as the dissent would use to divert a proper analysis of the law.

## FACTUAL AND PROCEDURAL BACKGROUND

The factual events of the incident began in the early evening of Saturday, April 17, 2010, at the home of Justin McCumbers, Brandon Junk, and Eric Blair. At the time, Christopher Markus had an agreement under which he would live in the home for two to four nights per week in a spare bedroom and pay $400 rent per month. McCumbers testified that Markus was staying overnight on the evening of the incident, as Markus normally stayed overnight during weekends.

That night, Markus, McCumbers, Junk, and Blair invited Joseph Winters, Cassie Gurley, and Julia Martin to their garage/recreation room to socialize. The

- 2 -

interior of this space was initially designed as a garage under the home which had been transformed into a common multi-purpose living or recreational room. The inside of the room contained two couches, one against the back wall and another against the right-side wall. A pool table was located in the center of the room. Located between the pool table and the back-wall couch was a small coffee table. The room also housed a small motorcycle and two grills.

Because the chain of events leading to the home entry, detention, and arrest of Markus were in dispute during trial, the officer's recollection of the facts are presented first, followed by the testimony of the witnesses who were present in the recreation room gathering that night. Our analysis must consider the totality of the facts, not simply aspects that may tend toward a predetermined result.

Officer Testimony

At 12:20 a.m. on April 18, 2010, Officer Roger David Prendergast and Officer R. Edu were dispatched to respond to a noise disturbance at a residence in Jacksonville Beach. The reported disturbance had already dissipated by the time the officers arrived. Prendergast noticed Markus and two other males standing outside a nearby residence, near a pickup truck parked along a public road. After observing that the two other males with Markus appeared to be drinking beer, Prendergast approached the men with the intent to instruct them to pour out their beverages. Prendergast testified that as he walked closer to Markus, he smelled

marijuana. Markus then purportedly exhaled away from Prendergast and flicked his cigarette he was smoking onto the ground outside the home behind the truck on the street. The dissent calls on factors not supported by or part of this record. Although Prendergast conceded that the smell of marijuana is not uncommon in Jacksonville Beach, and the only light available came from the street lights and the light emanating from the recreation room, Prendergast believed that Markus' cigarette contained marijuana. The exaggerated circumstances suggested by the dissent are not found in the record before us. As Prendergast approached Markus, he identified himself as law enforcement and asked Markus to stop to detain him and confiscate the marijuana. At this point, Prendergast was ten feet away from Markus. In response, Markus raised both hands and began to walk backward. Prendergast repeatedly instructed Markus to stop, but Markus allegedly turned around and ran into the opening to the garage/recreation room. Rather than stopping to collect the allegedly illegal marijuana cigarette, both officers followed Markus into the home. There is no suggestion in this record to support the speculation of the dissent for any other probable cause factors.

Prendergast further testified that once inside the home, Markus had situated himself on the right-side couch and began to resist the officers as they attempted to "take him down." Three additional officers arrived at the scene, including Officer T. Hawes. The officers pulled Markus off of the couch and onto the ground, face-

down.  Prendergast straddled Markus to apply the handcuffs, turned Markus on his side, and was alerted by Hawes that there was a black semiautomatic pistol in Markus' waistband.   Hawes retrieved the pistol and removed the ammunition. Prendergast proceeded to handcuff Markus and had him patted down.  Edu and Hawes then escorted Markus to the police vehicle.  It was not until <u>after</u> the officers entered the home without a warrant, physically handled Markus, and arrested Markus that Prendergast returned to the area near the pick-up truck to collect the marijuana cigarette.

Prendergast testified that neither he nor Edu had a warrant to enter the home, and they did not seek consent.  In addition, Prendergast and Hawes stated that they did not observe or participate in any search of the residence beyond the garage/recreation room.

Finally, Prendergast admitted that his arrest report totally failed to mention that Markus had turned around and fled into the home, but instead stated: "The defendant immediately began to <u>walk backwards</u> in attempt to move away from me." (Emphasis supplied.)

<u>Witness Testimony</u>

Justin McCumbers, who was in the home, testified that earlier that evening, he handed Markus a tobacco cigarette and lit it for him while in the recreation room.  Markus then walked outside to talk to two young men who were standing

along the road, very close to their vehicles which were parked in the driveway. McCumbers then observed two law enforcement officers with a flashlight approach Markus and the two other men. Markus raised his hands and asked, "What did I do? What did I do?" McCumbers observed Markus, who stands at six feet five inches and weighs almost 300 pounds, walking backward at a slow pace until he reached the couch inside the recreation room. The officers followed.

The officers had their Tasers drawn by the time they entered the recreation room. Markus sat down on the couch, hands still in the air. The officers instructed Markus to stand, but Markus replied that he could not stand due to knee problems.[1]

The officers proceeded to physically remove Markus from the couch, causing Markus to hit the pool table, fall backward, and strike one of the grills. The officers then pushed Markus forward, and he landed on the floor in front of the back-wall couch. McCumbers testified that Markus spun around like a human top. McCumbers observed the officer with his knee in Markus' lower back, holding both of his arms, and his foot on Markus' ear. At that point, a gun was recovered from Markus' area. As the officers attempted to handcuff Markus, Markus complained that he was experiencing intense pain in his wrist.

---

1. McCumbers testified that Markus had previously undergone knee surgery. Martin and Winter also testified to being aware that Markus suffered from knee problems.

At one point during the scuffle, Eric Blair's motorcycle was nearly knocked over, which prompted Blair to move toward the motorcycle to prevent it from falling. An officer shoved Blair against the wall and into Brandon Junk's guitar. Junk reactively arose from the couch, but was met with an officer's flashlight to his throat.

Meanwhile, Julia Martin had been upstairs in the restroom and heard a loud commotion. Martin testified that three officers ascended the stairs with their guns drawn and shouted, "Is anyone up there?" Martin made her presence known, and the officers pulled her out of the bathroom, threw her against the wall, and searched her. Martin further stated that the officers proceeded to search the upstairs bedrooms before escorting her downstairs to the recreation room, where she saw Markus on the ground with an officer standing over him.

McCumbers also confirmed that he saw an officer enter the interior of the residence while Markus was handcuffed. Upon reentering the home, McCumbers stated that he could see that the desk drawers, cabinets, and closet drawers had all been searched.

After Markus was detained, McCumbers observed an officer return from the direction of the street holding the remainder of an alleged marijuana cigarette.

Trial Court Proceedings

Markus was subsequently charged with possession of a firearm by a convicted felon, possession of less than twenty grams of cannabis, and resisting an officer without violence. Markus pled not guilty, and later filed a motion to suppress the evidence seized inside of the recreation room on the night of the arrest. Specifically, Markus argued that the firearm should not be admitted into evidence because it was obtained by the officers in violation of the Fourth Amendment of the United States Constitution and article I, section 12 of the Florida Constitution. A hearing was subsequently held to address the motion to suppress, where Officer Prendergast testified on behalf of the State and Justin McCumbers testified on behalf of Markus.

Following the hearing, the trial court issued an order denying Markus' motion to suppress. In its order, the trial court found that Prendergast's testimony that Markus turned around and fled into the home was more credible than McCumber's testimony that Markus walked backwards into the recreation room. The trial court also found that Prendergast observed Markus smoking a cigarette, and that when Markus exhaled smoke, Prendergast detected a strong smell of marijuana. Beyond that, the trial court did not make any additional findings of historical facts.

The trial court determined that Prendergast and Edu were justified in pursuing Markus once he turned and ran. Further, the court found that the pursuit

qualified as a valid exception, or exigent circumstance, to the Fourth Amendment's prohibition of unreasonable warrantless searches and seizures because it was a "hot" pursuit (i.e., the pursuit was continuous and immediate). The court relied on the district court cases State v. Brown, 36 So. 3d 770 (Fla. 3d DCA 2010), disapproved on other grounds by State v. Cable, 51 So. 3d 434 (Fla. 2010); Ulysse, 899 So. 2d 1233; and Gasset v. State, 490 So. 2d 97 (Fla. 3d DCA 1986), to conclude that hot pursuit of a fleeing misdemeanant is permissible when the crime is punishable by a jail sentence. A multi-day trial followed.

During trial, the jury was instructed that the State needed to prove two elements beyond a reasonable doubt to convict Markus: (1) that Markus had been convicted of a felony, and (2) that after the conviction, Markus "knowingly owned, had in his care, custody, possession, or control a firearm."

After hearing the testimony of Officers Prendergast and Hawes, two expert witnesses,[2] and witnesses to the incident,[3] the jury found Markus guilty of possession of a firearm by a convicted felon.

## District Court Proceedings

---

2. The expert witnesses were questioned to establish that Markus had previously been convicted of a felony and the firearm in evidence was in fact a functional firearm.

3. The witnesses to the incident who testified during trial were McCumbers, Martin, and Gurley.

Markus sought review of the trial court decision in the First District Court of Appeal. The district court ultimately reversed, concluding that the motion to suppress should have been granted. Markus, 160 So. 3d at 490.

The district court determined that once Markus crossed the threshold into the bottom floor room of his home, the Fourth Amendment became implicated. Id. at 490. The district court noted that the Florida Supreme Court has expressed the view that absent exigent circumstances, the threshold of a person's home may not be crossed. Id. at 491 (citing Riggs v. State, 918 So. 2d 274 (Fla. 2005)). Further, the district court reasoned that the exigent circumstance of hot pursuit is usually limited to the pursuit of fleeing felons, "because the seriousness of the crime is more likely to support the emergency nature of 'exigent circumstances.' " Id.

Relying on the United States Supreme Court decision in Welsh v. Wisconsin, 466 U.S. 740 (1984), the district court below recognized that the gravity of the offense which has generated police action is an important factor in determining whether hot pursuit applies. Markus, 160 So. 3d at 491. Specifically, the district court noted that the United States Supreme Court stated in Welsh that there is a presumption of unreasonableness that the State must rebut when a search is conducted in a home without a warrant, and that presumption is difficult to rebut when the offense is minor. Id. (citing Welsh, 466 U.S. at 750). Likewise, the district court noted that this Court in Riggs stated that to rebut the presumption of

unreasonableness, the State must demonstrate that there is a <u>grave</u> emergency that has made a warrantless search necessary to preserve the safety of the police and the community.  <u>Id.</u> at 492 (citing <u>Riggs</u>, 918 So. 2d 274).

The district court distinguished <u>Gasset</u>, in which hot pursuit was found applicable to an offense that did not rise to the level of a felony, because that case involved a dangerous high-speed chase.  <u>Id.</u> at 493.  Here, the district court concluded that the State totally failed to present evidence that the safety of the officers and the community or the preservation of the evidence was at risk.  <u>Id.</u> The court reasoned that the police could have retrieved the alleged marijuana cigarette from the ground without entering the home.  <u>Id.</u>  Moreover, the court below expressed concern that to hold that law enforcement may pursue any misdemeanant suspect simply because the offense imposes jail time would render the Fourth Amendment meaningless.  <u>Id.</u>  Accordingly, the district court reversed both the denial of the motion to suppress and the conviction.  <u>Id.</u> at 489-90.

This review follows.

## ANALYSIS

### Conflict Jurisdiction

This question presents a pure question of law and is, therefore, subject to de novo review.  <u>See</u> <u>Jackson-Shaw Co. v. Jacksonville Aviation Auth.</u>, 8 So. 3d 1076, 1084-85 (Fla. 2008).  The conflict we must now resolve between the

decision below and <u>Ulysse</u> is the result of a misunderstanding of United States Supreme Court and Florida precedent in the arena of Fourth Amendment home searches and arrests.  Contrary to the understanding of the Third District in <u>Ulysse</u> and the State, the Fourth Amendment does not permit a home search and arrest by hot pursuit of a nonviolent misdemeanant simply because the nonviolent offense for which there was probable cause was jailable.  The dissent formulates an analysis beyond that of the parties in this proceeding below.

In <u>Ulysse</u>, law enforcement engaged in the pursuit of a stolen vehicle.  899 So. 2d at 1234.  Once the vehicle stopped, the driver and passenger of the vehicle fled on foot.  <u>Id.</u>  The passenger ran into the home of a stranger, who turned out to be Ulysse.  <u>Id.</u>  The officers followed the passenger into the house and discovered narcotics and a firearm.  <u>Id.</u>  Ulysse was charged with cocaine possession with intent to sell, resisting an officer without violence, and possession of a firearm by a convicted felon.  <u>Id.</u>  The trial court denied Ulysse's motion to suppress, and the Third District affirmed.  <u>Id.</u>

In addition to its reasoning that "a reasonable officer would have probable cause to believe that the passenger had participated in the theft of the car, or at the least, trespass in a conveyance," the court relied on <u>Gasset</u> to support the conclusion that "[h]ot pursuit of a fleeing misdemeanant is permissible <u>where the misdemeanor is punishable by a jail sentence</u>."  <u>Id.</u> (emphasis supplied) (citation

- 12 -

omitted).[4]  This statement is in conflict with the holding in the case below, where a jailable offense did not rise to the exigency of hot pursuit, and directly conflicts with the conclusion in the case below that "[the First District] cannot accept the State's position that officers may freely pursue every misdemeanor or traffic suspect into his or her home without a warrant <u>so long as the offense is punishable by any jail time</u>."  <u>Markus</u>, 160 So. 3d at 493 (emphasis supplied).

After reviewing the Third District's opinion in <u>Gasset</u>, we conclude that <u>Gasset</u> does not support the proposition that <u>any</u> jailable offense authorizes the exigent circumstance of hot pursuit to justify a warrantless entry.  The <u>Gasset</u> court never delineated nonjailable versus jailable offenses as a bright-line boundary that

---

4.   The Third District likewise stated in <u>Brown</u> that hot pursuit is permissible for jailable misdemeanors.  However, because the holding in <u>Brown</u> does not turn upon whether the offense was jailable, we conclude that <u>Brown</u> is reconcilable with the case below.  While <u>Brown</u> involved a misdemeanor offense, the defendant in that case was also observed with an "assault-type rifle" walking to a vehicle with its engine running and the lights off, and subsequently running into an apartment once the police identified themselves.  <u>Brown</u>, 36 So. 3d at 771.
Ultimately, the <u>Brown</u> court's holding relied upon the danger of the offense, rather than the fact that it was jailable:

> The time of day, the presence of an assault-type rifle, the disregarded commands to stop, and the possible threat of an uncooperative suspect with a weapon, were overwhelming reasons to follow Brown into the home.  In accordance with <u>Ulysse</u> and <u>Gasset</u>, we therefore find that no constitutional violation was involved in this case.

<u>Id.</u> at 773.

- 13 -

justifies hot pursuit when crossed; the Gasset court merely pointed out, among other distinguishing factors, that the offense in Welsh was nonjailable.  Therefore, the Gasset court's primary concern was directed to the violence of the offense, as opposed to whether it was jailable.  Indeed, in its holding the Gasset court emphasized the danger that the defendant's crime imposed:

> Gasset's actions in this case were of sufficient gravity to justify the de minimis intrusion involved here.  He jeopardized his own safety, the safety of others, and that of the general public.  By his own actions, he cast aside any fourth amendment shield which might have served to protect him.  We will not erect one for him now.

Gasset, 490 So. 2d at 99.

The practical impact that would flow from the dissent's analysis is opening the home to government entry for the most minor factors.  Furthermore, a survey of the history of the Fourth Amendment and accompanying jurisprudence demonstrates that it would fly in the face of constitutional bedrock principles to hold that any jailable offense—regardless of how minor—justifies a warrantless home search and arrest by hot pursuit.  We thus disapprove Ulysse to the extent that it holds that a jailable offense always justifies hot pursuit, without limitations and regard for the gravity of that offense.

## Merits

A person's right to be secure from searches and seizures is derived from the Fourth Amendment to the United States Constitution. This right is reflected in article I, section 12 of Florida's Declaration of Rights, which provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause, supported by affidavit, particularly describing the place or places to be searched, the person or persons, thing or things to be seized, the communication to be intercepted, and the nature of evidence to be obtained. This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.

While the conformity clause within this section requires this Court to adhere to the interpretations of the United States Supreme Court, this Court is not bound to follow the decisions of other federal courts. Smallwood v. State, 113 So. 3d 724, 730 (Fla. 2013). In the event that there is no United States Supreme Court precedent factually and legally on point, Florida appellate courts may review Florida state precedent, as well as other state and federal decisions for guidance on a search and seizure issue. Higerd v. State, 54 So. 3d 513, 517 (Fla. 1st DCA 2010); Jones v. State, 459 So. 2d 1068, 1072 (Fla. 2d DCA 1984). Upon review of a ruling on a motion to suppress, this Court "accord[s] a presumption of correctness . . . to the trial court's determination of historical facts, but . . .

independently review[s] mixed questions of law and fact that ultimately determine constitutional issues." Fitzpatrick v. State, 900 So. 2d 495, 510 (Fla. 2005) (quoting Nelson v. State, 850 So. 2d 514, 521 (Fla. 2003)).

A person has standing to claim Fourth Amendment protection if that person has a reasonable expectation of privacy in the invaded place. Minnesota v. Olson, 495 U.S. 91, 95 (1990) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). It is well established that an overnight guest is afforded a reasonable expectation of privacy in his or her place of stay. See id. at 96-100.

Further, the reasonable expectation of privacy not only applies to the inside of a person's home, but to the curtilage of the home as well. California v. Ciraolo, 476 U.S. 207, 212-13 (1986) ("The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened."). In 2011, the United States Court of Appeals for the Eleventh Circuit was tasked with resolving the issue of whether an attached but open garage—as opposed to a closed and locked garage, or a completely open carport— was afforded Fourth Amendment protection. Coffin v. Brandau, 642 F.3d 999, 1010 (11th Cir. 2011). The Coffin court observed that although there is an abundance of case law that may address the high level of Fourth Amendment protection afforded to a home generally, there is not a corresponding amount of

case law that addresses separately any different Fourth Amendment status of an attached but open garage, not only in Florida but throughout the country.  Id.  Ultimately, the Coffin court held that Fourth Amendment protection extends to an open but attached garage because such a space—with three walls and a door—may be enclosed for privacy.  Id. at 1013.

This reasoning that an attached garage is afforded a reasonable expectation of privacy is further bolstered by the common use of garages as multi-purpose rooms.  In the instant case, Markus and his roommates obviously utilized the room for recreation and other uses.  The room contained couches, a coffee table, and a pool table—all elements that indicate that the room is not used for storage, but also for various purposes clearly associated with the use of a home.  In fact, on the night of the incident, the room was in use by members of that household for general social purposes.  The State argues that because the recreation room in this case where the transgression occurred was housed in a room that was originally designed to be a garage, Markus should not be afforded constitutional protection or the same reasonable expectation of privacy that a person of greater economic status with the means to maintain a more elegant, separate recreation room would be afforded.  Even the dissent seems to avoid this argument.  Not only is this unsupported by law, but this is an inherently unfair proposition that we cannot support.  A recreation room is a traditional area of American living.  Not every

citizen may have the means to live in a house with additional space for such a separate room. We will not discriminate against Markus' reasonable expectation of privacy simply because his recreation room served multiple purposes. Whether an individual's house be gilded with gold or held together by the humblest of bricks, the Florida and United States constitutions afford the same rights to <u>all</u>. As the United States Supreme Court has said, "We have, after all, lived our whole national history with an understanding of 'the ancient adage that a man's house is his castle . . . .' " <u>Georgia v. Randolph</u>, 547 U.S. 103, 115 (2006) (quoting <u>Miller v. United States</u>, 357 U.S. 301, 307 (1958)). Therefore, we approach this case with the understanding that Markus had a reasonable expectation of privacy in the area utilized as an attached recreational/garage facility.

The State further petitions us to hold that we need not look to anything other than the laws to perfect arrest, without regard to how miniscule the violation may be. This is not a holding that the Fourth Amendment can support. The Fourth Amendment has never been interpreted this broadly in the past, and we will not do so today. To better grasp the importance of adhering to the boundaries set forth by the Fourth Amendment, it is helpful to examine the state of history that led to creation of this constitutional right. The United States Supreme Court painted a picture of the turbulent times which led to our nation's founding—a time wrought

with frustration over England's unrestricted authority over the colonists—in

Stanford v. Texas, 379 U.S. 476 (1965):

> The[] . . . words [of the Fourth Amendment] are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant. Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as "the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book," because they placed "the liberty of every man in the hands of every petty officer." The historic occasion of that denunciation, in 1761 at Boston, has been characterized as "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. 'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.' " Boyd v. United States, 116 U.S. 616, 625 [(1886)].

379 U.S. at 481-82. The Court in Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294 (1967), also recognized, "[The Fourth Amendment] was a reaction to the evils of the use of the general warrant in England and the writs of assistance in the Colonies, and was intended to protect against invasions of 'the sanctity of a man's home and the privacies of life,' from searches under indiscriminate, general authority." 387 U.S. at 301 (citation omitted) (quoting Boyd, 116 U.S. at 630).

Years later, in Payton v. New York, 445 U.S. 573 (1980), the United States

Supreme Court recalled the history of the drafting of the Fourth Amendment itself,

and discussed the fact that Congress' specific concern with the sanctity of the

home shaped the Fourth Amendment that we know today:

> [A]s originally proposed in the House of Representatives, the draft
> contained only one clause, which directly imposed limitations on the
> issuance of warrants, but imposed no express restrictions on
> warrantless searches or seizures. . . .
>
> It is thus perfectly clear that the evil the Amendment was
> designed to prevent was broader than the abuse of a general warrant.
> Unreasonable searches or seizures conducted without any warrant at
> all are condemned by the plain language of the first clause of the
> Amendment. Almost a century ago the Court stated in resounding
> terms that the principles reflected in the Amendment "reached farther
> than the concrete form" of the specific cases that gave it birth, and
> "apply to all invasions on the part of the government and its employés
> of the sanctity of a man's home and the privacies of life."

445 U.S. at 583-85 (footnote omitted) (quoting Boyd, 116 U.S. at 630).

With this rich history in mind, the United States Supreme Court has

consistently hailed the sanctity of one's home as a right to be fervently guarded,

and has notably used strong language in doing so. In Florida v. Jardines, 133 S. Ct.

1409 (2013), the Court explained, "At the Amendment's 'very core' stands 'the

right of a man to retreat into his own home and there be free from unreasonable

governmental intrusion.' " Id. at 1414 (quoting Silverman v. United States, 365

U.S. 505, 511 (1961)). Similarly, the Court in Randolph reasoned, "Since we hold

to the 'centuries-old principle of respect for the privacy of the home,' 'it is beyond

- 20 -

dispute that the home is entitled to special protection as the center of the private lives of our people.' " Randolph, 547 U.S. at 115 (citation omitted) (quoting Wilson v. Layne, 526 U.S. 603, 610 (1999), and Minnesota v. Carter, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring)).  In fact, the Court has repeatedly referred to the invasion of the privacy of the home as the "chief evil" that the Fourth Amendment was created to protect.  See, e.g., Payton v. New York, 445 U.S. 573, 585-86 (1980) ("As the Court reiterated just a few years ago, the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'  And we have long adhered to the view that the warrant procedure minimizes the danger of needless intrusions of that sort."  (quoting United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972))); see also New York v. Harris, 495 U.S. 14, 18 (1990) ("Payton nevertheless drew a line at the entrance to the home.  This special solicitude was necessary because 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (quoting Payton, 445 U.S. at 585)); Welsh, 466 U.S. at 748 ("It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (quoting U.S. Dist. Court, 407 U.S. at 313)); Michigan v. Summers, 452 U.S. 692, 702 n.13 (1981) (quoting U.S. Dist. Court, 407 U.S. at 313, and Payton, 445 U.S. at 585-86).

Of course, the Court has acknowledged that with this unfettered protection of the rights of the American citizen comes certain necessary sacrifices. Indeed, the rights afforded by the Fourth Amendment at times have the effect of limiting the ability of police officers to apprehend criminals. See McDonald v. United States, 335 U.S. 451, 453 (1948) ("This guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike."). On this point we are reminded of the poignant words of the late Justice Leander Shaw, Jr., who, as a member of this Court, elaborated on the importance of protecting the rights of all citizens—not just those who appear deserving:

> Special vigilance is required where the fundamental rights of Florida citizens suspected of wrongdoing are concerned, for here society has a strong natural inclination to relinquish incrementally the hard-won and stoutly defended freedoms enumerated in our Declaration in its effort to preserve public order. Each law-abiding member of society is inclined to strike out at crime reflexively by constricting the constitutional rights of all citizens in order to limit those of the suspect—each is inclined to give up a degree of his or her own protection from government intrusion in order to permit greater intrusion into the life of the suspect. The framers of our Constitution, however, deliberately rejected the short-term solution in favor of a fairer, more structured system of criminal justice[.]

Traylor v. State, 596 So. 2d 957, 963 (Fla. 1992) (discussing the Florida Declaration of Rights). With that, the purpose of the warrant is not to provide "a safe haven for illegal activities," but rather, to allow "an objective magistrate to determine whether there is probable cause to invade the privacy of one's home." McDonald, 335 U.S. at 455. It is therefore important to remember that there are

two conflicting interests that both this Court and the United States Supreme Court have long sought to balance in Fourth Amendment jurisprudence: on the one hand, a person's personal interest in the security of his or her own home; on the other hand, the interest of officer safety, as well as the ability of law enforcement to have the access necessary to effectively protect the community.  Riggs, 918 So. 2d at 278-79 (noting the interest in police safety); Hornblower v. State, 351 So. 2d 716, 719 (Fla. 1977) (citing Johnson v. United States, 333 U.S. 10, 13-14 (1948) (explaining the public policy balance between individual interests and public interests)).  The dissent appears to begin its analysis with a thumb on the scales in favor of government entry.  The Court in Johnson likewise explained that having a neutral magistrate, rather than a potentially "zealous" officer, is key to maintaining this balance:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.  Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.  Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing.  The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.  When the right of

> privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

333 U.S. at 13-14 (emphasis supplied) (footnotes omitted).

Given the careful attention this Court and the United States Supreme Court have granted to protect the sanctity of the home, it comes as no surprise that warrantless searches are presumed unreasonable with few carefully tailored exceptions. See, e.g., Payton, 445 U.S. at 585; Coolidge v. New Hampshire, 403 U.S. 443, 473 (1971); Smallwood, 113 So. 3d at 729; Riggs, 918 So. 2d at 278-79. The burden is on the State to demonstrate that an exigent circumstance existed to justify the warrantless search. See Riggs, 918 So. 2d at 278. To carry that burden, the State must show an existence of probable cause and exigent circumstances to validate the warrantless entry. Welsh, 466 U.S. at 749 (citing Payton, 445 U.S. at 583-90). Exigent circumstances require that there be a " 'grave emergency' that 'makes a warrantless search imperative to the safety of the police and of the community.' " Riggs, 918 So. 2d at 278-79 (emphasis supplied) (quoting Illinois v. Rodriguez, 497 U.S. 177, 191 (1990)). This Court has defined an "imperative" warrantless entry as one where "the government can show 'a compelling need for official action and no time to secure a warrant.' " Id. at 279 (quoting Michigan v. Tyler, 436 U.S. 499, 509 (1978)). Moreover, this Court has described the lack of time to secure a warrant as a "key ingredient" of exigency, and further noted that

- 24 -

an officer must cease the search once he or she realizes that the exigency no longer exists.  Id. (quoting Rolling v. State, 695 So. 2d 278, 293 (Fla. 1997)).

The United States Supreme Court has consistently recognized three major categories of exigent circumstances: (1) the emergency aid exception, whereby an officer enters a home to render emergency assistance to an occupant who is seriously injured or for whom serious injury is imminent; (2) "to prevent the imminent destruction of evidence"; and (3) the hot pursuit exception, which allows officers to proceed into a residence without a warrant if they are in the process of the continuous hot pursuit of a fleeing suspect.  See Kentucky v. King, 563 U.S. 452, 460 (2011); Brigham City v. Stuart, 547 U.S. 398, 403 (2006).  The rationale supporting the exception of hot pursuit was aptly summarized by the United States Supreme Court in United States v. Santana, 427 U.S. 38, 43 (1976): "[A] suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place."  Specifically, a key ingredient of hot pursuit is an element of danger or grave emergency.  See Welsh, 466 U.S. at 753 (holding that the gravity of the circumstances must be considered in cases of hot pursuit); McDonald, 335 U.S. at 455 (concluding that a warrantless search resulting in the discovery of an illegal lottery operation did not rise to the level of exigency because "[a]bsent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police").

Reviewing courts measure the reasonableness of a warrantless entry by the totality of the circumstances.  Missouri v. McNeely, 133 S. Ct. 1552, 1559 (2013) (citing Stuart, 547 U.S. at 406; Illinois v. McArthur, 531 U.S. 326, 331 (2001); Richards v. Wisconsin, 520 U.S. 385, 391-96 (1997); Cupp v. Murphy, 412 U.S. 291, 296 (1973)).  The United States Supreme Court has explained that the evaluation of the totality of the circumstances is a "finely tuned approach" that is applied to determine reasonableness under the Fourth Amendment when the actions of law enforcement lack the "traditional justification" provided by a warrant.  McNeely, 133 S. Ct. at 1559 (quoting Atwater v. City of Lago Vista, 532 U.S. 318, 347 n.16 (2001)).  Without the justification of a warrant, the Court has reasoned, " 'the fact-specific nature of the reasonableness inquiry,' . . . demands that we evaluate each case of alleged exigency based 'on its own facts and circumstances.' "  Id. (citation omitted) (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996), and Go-Bart Importing Co. v. United States, 282 U.S. 344, 357 (1931)).

Welsh is the seminal case that courts look to in determining whether probable cause for a minor offense authorizes law enforcement to conduct a warrantless home search and arrest.  In Welsh, a witness observed a car swerve off the road and stop in a field.  466 U.S. at 742.  The witness told the driver, Welsh, to wait for assistance to remove the car, but Welsh walked away from the scene.  Id.  When the police arrived, the witness informed the officers that Welsh was

inebriated or sick.  Id.  The police obtained Welsh's address after checking the registration of the abandoned car, but failed to obtain a search warrant.  Id. at 742-43.  Upon the officers' arrival at Welsh's home, Welsh was found naked in bed.  Id. at 743.  The police arrested Welsh for driving under the influence.  Id.  Welsh refused to submit to a breath-alcohol test, and was thus subject to a possible sixty-day revocation of his driver's license pursuant to a Wisconsin statute.  Id. at 743-44.  The trial court found that Welsh's arrest was lawful and imposed the sixty-day license revocation, but the Wisconsin Court of Appeals vacated the order on the basis that the initial, warrantless entry of his home violated the Fourth Amendment.  Id. at 744.

On review, the United States Supreme Court explained that while the Court in Payton held that a warrantless search and arrest in the home was prohibited absent probable cause and exigent circumstances, the Payton court had declined to consider the scope of exigent circumstances that would justify a home entry and thereby left the nuances of exigency to the determination of lower courts.  Id. at 742.  Therefore, the Welsh court addressed the issue of "whether, and if so under what circumstances, the Fourth Amendment prohibits the police from making a warrantless night entry of a person's home in order to arrest him for a nonjailable traffic offense."  Id. at 742.  Although the issue addressed a nonjailable traffic offense, throughout the opinion the Court repeatedly emphasized that the offense

was "minor," as opposed to "nonjailable."  Specifically, the Court expressed its hesitation to find that exigency exists when the underlying offense for which there is probable cause is a minor one.  Id. at 750.  Furthermore, the Welsh court observed that most lower courts have refused to permit warrantless home arrests for nonfelonious crimes.  Id. at 752.  The Court thus concluded that when the offense is minor, a home arrest should usually be accompanied by a warrant.  Id. at 753.  This is a view rejected by the dissent contrary to controlling authority.

The Welsh court proceeded to rely on the reasoning in Justice Jackson's concurrence in McDonald.  Id. at 750-51.  In that concurrence, Justice Jackson expressed his discomfort with allowing warrantless home arrests in situations where the underlying offense did not pose a threat of violence:

> Whether there is reasonable necessity for a search without waiting to obtain a warrant certainly depends somewhat upon the gravity of the offense thought to be in progress as well as the hazards of the method of attempting to reach it. . . .  It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve no violence or threats of it.  While I should be human enough to apply the letter of the law with some indulgence to officers acting to deal with threats or crimes of violence which endanger life or security, it is notable that few of the searches found by this Court to be unlawful dealt with that category of crime . . . .  When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.

Id. at 751 (quoting McDonald, 335 U.S. at 459-60 (Jackson, J., concurring)).

Ultimately, the <u>Welsh</u> court held that the gravity of the offense committed by the suspect is an important factor to consider when determining whether there are exigent circumstances to justify a warrantless search:

> We therefore conclude that the common-sense approach utilized by most lower courts is required by the Fourth Amendment prohibition on "unreasonable searches and seizures," and hold that <u>an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made</u>. Moreover, although no exigency is created simply because there is probable cause to believe that a serious crime has been committed, see <u>Payton</u>, application of the exigent-circumstances exception in the context of a <u>home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed</u>.

<u>Id.</u> at 753 (emphasis supplied).

The dissent attempts to enhance the gravity of the circumstances here without factual support. In applying the facts of the case to its reasoning, the Court recognized that there was no real pursuit of Welsh, and he was already at home and in bed by the time the officers pursued him. Moreover, Welsh was no longer a threat to public safety once he abandoned his car and entered his home. Therefore, Welsh's arrest was determined to be invalid.

Likewise, in looking to the totality of the circumstances, Florida courts have also found probable cause for minor offenses insufficient to justify warrantless home searches and arrests. See <u>M.J.R. v. State</u>, 715 So. 2d 1103, 1104 (Fla. 5th DCA 1998) ("The underlying offenses for which M.J.R. could have been, and was,

- 29 -

arrested are only misdemeanors, and there is no authority given to a police officer to enter a suspect's home to effect a warrantless arrest for a misdemeanor."); Conner v. State, 641 So. 2d 143, 144 (Fla. 4th DCA 1994) ("Applying Welsh, we do not believe that the misdemeanor of resisting arrest without violence or even the 'battery' [that defendant committed in pushing and slapping another person] constituted serious enough offenses to uphold the warrantless entry into defendant's home for what were then two minor misdemeanors."). [5]

In the instant case, the State has failed to demonstrate that the totality of the circumstances justified application of the hot pursuit exception to the Fourth Amendment's warrant requirement. Markus did not pose a danger to the public, to the police, or to anyone. Specifically, Markus was observed by the officer to be smoking what was alleged to be a marijuana cigarette and threw the cigarette onto the ground. The officers could have simply secured the evidence without any

---

5. Cases that turned on the application of section 901.19, Florida Statutes (1989) (Florida's knock and announce statute), also correspond with the conclusion that minor offenses are generally not sufficient to give rise to exigent circumstances. Ortiz v. State, 600 So. 2d 530, 531-32 (Fla. 3d DCA 1992) ("When Ortiz ran into the apartment, he dropped the small baggie of marijuana, and the police had probable cause to believe that Ortiz had committed a misdemeanor. . . . Therefore, the officers did not have the authority under subsection 901.19(1) to enter Ortiz' apartment."); Johnson v. State, 395 So. 2d 594, 596 (Fla. 2d DCA 1981) ("Under state law [section 901.19, Florida Statutes (1979),] there is simply no authority given to a police officer to enter a building to effect a warrantless arrest for a misdemeanor.").

problem. When he was approached, Markus did not jump over a fence or cross into a neighboring yard; rather, the evidence shows that Markus walked backwards with his hands up, and moved a few feet into his open garage/recreation room. This was not hot pursuit—this was slow pursuit at best. Markus could not escape because he was in actual view of the officers the entire time. There were no hostages, no threat of weapons, and no danger. The State merely uses a broad brush to paint hot pursuit in total isolation from the totality of the circumstances. However, as we have observed in multiple United States Supreme Court opinions, it is inescapable to look to the gravity of the circumstances; this is critical to promote homeowner and public safety, as well as officer safety. The potential danger that accompanies an officer's entry into the private dwelling of an individual is not to be taken lightly. We cannot endorse a standard that would encourage such needless entries, and thus increase the potential for officer injuries or fatalities. See, e.g., Rodriguez v. State, 964 So. 2d 833, 837 (Fla. 2d DCA 2007) (invalid warrantless entry resulting in battery of officer and death of suspect).

In this particular case, the officer had no need to enter the home, not only because the suspected offense was minor, but also because the evidence was at hand with no risk of imminent destruction. The officer was free to retrieve the cigarette from the public street as evidence without entering the residence; in fact,

- 31 -

the officer later returned to the driveway area after the constitutional violation and scuffle to recover the alleged cigarette. Thus, it is clear that the officer here avoided the evidence.

While the United States Supreme Court has not explicitly held that the imminent destruction of evidence itself constitutes a separate category of exigency, the Court has mentioned it as a factor. King, 563 U.S. at 460 ("[T]he need 'to prevent the imminent destruction of evidence' has long been recognized as a sufficient justification for a warrantless search." (quoting Stuart, 547 U.S. at 403)); Stuart, 547 U.S. at 403 ("We have held, for example, that law enforcement officers may make a warrantless entry onto private property to . . . prevent the imminent destruction of evidence . . . ." (citing Ker v. California, 374 U.S. 23, 40 (1963) (plurality opinion)). The Court has especially expressed concern when the only apparent reason for failing to obtain a search warrant is mere inconvenience, as opposed to the possibility that the evidence could be destroyed. In Johnson, a case involving the unwarranted search of a home that resulted in the discovery of illegal narcotics, the Court explicitly condemned the excuse of convenience:

> No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. These are never very convincing reasons and, in these circumstances, certainly are not enough to bypass the constitutional requirement. No suspect was fleeing or likely to take flight. The search was of permanent premises, not of a movable vehicle. No evidence or contraband was threatened with removal or destruction . . . .

Johnson, 333 U.S. at 15.  When, as here, law enforcement disregards the evidence to pursue a nonviolent suspect, the result is ineffective police work.  As was true of the officers in Johnson, the only apparent reason that the officers had for failing to obtain a search warrant was mere inconvenience.  The Fourth Amendment does not condone such behavior.  It is in the interest of this Court to promote safety and efficiency, not impulsive and needlessly risky encounters.

The State primarily relies on the United States Supreme Court decisions in Stanton v. Sims, 134 S. Ct. 3 (2013), and Santana, 427 U.S. 38, to support the contention that the gravity of the crime is irrelevant when determining the validity of hot pursuit.  This reliance is misplaced.  In Stanton, the United States Supreme Court discussed whether the dangerousness of the underlying crime is a factor to be considered in cases of hot pursuit, but did not provide a definitive answer.  In Stanton, the Court stated in dictum that Welsh did not preclude warrantless home arrests for misdemeanors, but rather established that such arrests should be rare. 134 S. Ct. at 6.  Stanton, however, was not a criminal case, and therefore the Court explicitly stated that it was not ruling on constitutionality.  Stanton merely addressed whether an officer was protected under qualified immunity in a civil action seeking damages.[6]  Thus, we are unpersuaded by the State's reliance on

6. The standard for a federal action pursuant to section 1983 is heightened from the standard in the instant case.  Specifically, plaintiffs who file civil actions filed under 42 U.S.C. § 1983 (1996) must demonstrate that "(1) [a government

Stanton for the proposition that the surrounding circumstances and gravity of the crime are of no consequence in Fourth Amendment analysis. The State also relies on Santana, which provides that an individual cannot escape arrest by merely escaping to a private place. 427 U.S. at 43. However, the statement in Santana was written in the context of a dangerous felony—not a nonviolent misdemeanor, as observed in the instant case. Therefore, Santana also fails to bolster the State's position.

Furthermore, the outcome petitioned for by the State—that any jailable offense be subject to hot pursuit, regardless of how minor—would unleash irrational and invasive results on the public. For example, there are a number of potentially jailable Jacksonville Beach Code violations that would render the enforcement of such a holding absurd.[7] Specifically, jaywalking and littering are among the potentially jailable offenses outlined in the Jacksonville Beach Code.

---

official] violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011).

7. See, e.g., Jacksonville Beach, Fla., Code of Ordinances § 3-2 (posting signs on any public property or trees); § 3-4 (tearing down a lawfully placed poster); § 3-20 (depositing a handbill or pamphlet upon uninhabited or vacant premises); § 2.5-11 (failing to have a designated person deactivate an audible alarm system on commercial premises within thirty minutes of its initiation); § 6-4 (possession of a glass container while on the beach); § 6-52 (use of a recreational beach float or float-boat beyond one hundred yards of the shore); § 6-7 (removal of a shell, sand, or coquina from the beach).

Jacksonville Beach, Fla., Code of Ordinances §§ 31-3, 16-7 (2015).  Under the State's logic, police suspicion of such minor code violations would allow an officer to invade a citizen's home without a warrant.  Contrary to the dissent, these are unacceptable consequences that we cannot endorse.  Indeed, such a holding and the dissenting view would allow local legislative bodies to override the warrant requirement of the federal and state constitutions.  Thus, we cannot approve an outcome that tramples over the Fourth Amendment rights of our citizens and the age-old doctrine of separation of powers.

In the case before us, we have been presented with a factual scenario that requires relief and not an expansion of warrantless entries.  The suspicion of a minor, nonviolent misdemeanor coupled with the officers' failure to respect the restraints of the federal and state constitutions resulted in an extremely invasive search and seizure.  The officers testified that the initial underlying crime for which there was probable cause was the nonviolent offense of possession of a marijuana cigarette not some further circumstances fabricated by the dissent.  Rather than retrieving the alleged illegal cigarette, the officers avoided the evidence.  The officers in the area could have remained in the area of the house as they waited to obtain a warrant from a neutral magistrate, but failed to do so.  Instead, they entered the home without a warrant and proceeded to manhandle Markus, his roommates, and their guests.  One young woman testified that she was

dragged out of a bathroom and thrust against a wall. Markus' roommate testified that the drawers and closets inside of the home were in disarray following the incident, yet the officers say they never went beyond the garage. Fear, chaos, and violence erupted in Markus' home that night—all for the sake of apprehending a man who allegedly had a marijuana cigarette.

The State asks us to plow open the homes of American citizens and permit this kind of police behavior, even though doing so would overstep hundreds of years of legal history. The sanctity of the home is paramount and we cannot do so. A statement attributed to William Pitt, Earl of Chatham, which was quoted by the United States Supreme Court, resonates with us:

> The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!

Miller, 357 U.S. at 307 (quoting Oxford Dictionary of Quotations 379 (2d ed. 1953)). It is in this spirit that we continue to preserve the sanctity of the home today. Accordingly, we hold that the exigent circumstance of hot pursuit here on these facts does not justify a warrantless home search and arrest when the underlying conduct for which there is probable cause is the alleged violation here—a nonviolent misdemeanor. We thus approve the First District's decision to reverse the denial of Markus' motion to suppress and to reverse Markus'

conviction. We further disapprove <u>Ulysse</u> to the extent that it conflicts with this decision.

It is so ordered.

LABARGA, C.J., and PARIENTE, and QUINCE, JJ., and PERRY, Senior Justice, concur.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., dissenting.

Because I conclude that there is no justification for a misdemeanor-offense exception from the rule that "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place," <u>United States v. Santana</u>, 427 U.S. 38, 43 (1976), I dissent. The challenged conduct of the police in this case was entirely reasonable. And the majority's decision will only serve to encourage unlawful resistance to the proper exercise of police authority.

The majority's ruling that the hot pursuit exception to the warrant requirement was not applicable in this case is predicated on three crucial errors. First, the majority slights the actual reasoning of <u>Santana</u>—the Supreme Court case that provides the definitive explanation of the hot pursuit exception—concerning the basis for that exception. Second, the majority mischaracterizes the nature of the police pursuit of Markus, suggesting that there was no hot pursuit. In doing so,

the majority fails to follow the analysis required by <u>Santana</u>. Third, the majority

misreads the Supreme Court's decision in <u>Welsh v. Wisconsin</u>, 466 U.S. 740

(1984), as laying down rules governing the scope of the hot pursuit exception. The

majority's understanding of <u>Welsh</u> cannot be squared with what <u>Welsh</u> plainly

holds or how the Supreme Court explained <u>Welsh</u> in <u>Stanton v. Sims</u>, 134 S. Ct. 3

(2013). The culmination of the majority's multifaceted misreading of the Supreme

Court's decisions is a ruling that rewards wrongdoers for escaping from lawful

detention by the police—a ruling that undermines the Constitution's scheme of

ordered liberty. Rather than adopt the majority's flawed analysis, I would hold that

the hot pursuit exception applies whenever a legally authorized arrest for a

criminal offense—including a misdemeanor offense—has been set in motion in a

public place and the subject flees to a private place with the police in pursuit.[8]

# I.

The majority dismisses the holding of <u>Santana</u> on the ground that "<u>Santana</u>

was written in the context of a dangerous felony—not a nonviolent misdemeanor,

as observed in the instant case." Majority op. at 34. The problem with the

---

8. Beyond my disagreement with the majority's legal analysis, I strongly
object to the way the majority castigates the police for their conduct in this case. It
is wholly unwarranted to denounce the police for "ineffective police work" and for
engaging in an "impulsive and needlessly risky encounters." <u>See</u> majority op. at
33. Here, the conduct of the police was in perfect accord with the law previously
established by <u>Ulysse v. State</u>, 899 So. 2d 1233 (Fla. 3d DCA 2005).

majority's assertion is that it is totally divorced from the analysis actually employed in <u>Santana</u>. Although it is apparent in <u>Santana</u> that the police sought to make an arrest for a felony—distribution of heroin—that fact plays no part in the reasoning of <u>Santana</u>. Indeed, the majority opinion in <u>Santana</u> does not contain the word "felony." And the Court's opinion contains not a hint that the nature of the offense had any bearing on the Court's holding. Since <u>Santana</u> was decided, the Supreme Court's decisions provide nothing to support the narrow view of <u>Santana</u> espoused by the majority here. Quite the contrary. In <u>Stanton</u>, the Supreme Court took pains to observe: "[T]hough <u>Santana</u> involved a felony suspect, we did not expressly limit our holding based on that fact." <u>Stanton</u>, 134 S. Ct. at 6 (citing <u>Santana</u>, 427 U.S. at 42).

Rather than focusing on the category of the offense, the Court relied on the right of the police to make a warrantless arrest in a public place, and the inappropriateness of allowing such a constitutionally permissible warrantless arrest to be thwarted by the suspect's unlawful flight to a private place. The analysis in <u>Santana</u> thus involved two simple elements. First, the Court recounted the law recognizing the authority of the police based on probable cause to effect arrests in public places and determined that the suspect had been in a public place when the police initiated her arrest. Second, the Court considered the "remaining question"

of "whether [the suspect's] act of retreating into her house could thwart an otherwise proper arrest." Santana, 427 U.S. at 42.

As the beginning of its analysis, Santana cited the holding of United States v. Watson, 423 U.S. 411 (1976), that "the warrantless arrest of an individual in a public place upon probable cause did not violate the Fourth Amendment." Santana, 427 U.S. 38 at 42. Watson addressed the authority of the police to make a warrantless arrest for a felony offense. But the parallel authority of the police to conduct a warrantless arrest in a public place for nonfelony criminal offenses—at least when committed in the presence of the police—is well established.

In Atwater v. City of Lago Vista, 532 U.S. 318, 340 (2001), a case involving an arrest for certain traffic offenses observed by the arresting officer, the Court rejected an argument that warrantless arrests for misdemeanors were permissible only for offenses involving breach of the peace: "We simply cannot conclude that the Fourth Amendment, as originally understood, forbade peace officers to arrest without a warrant for misdemeanors not amounting to or involving breach of the peace." Atwater therefore held: "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." 532 U.S. at 354 (emphasis added). The constitutional authority justifying the arrest of Markus

that the police sought to make in this case is therefore equivalent to the constitutional authority set forth in Watson and relied on in Santana.

On the second fundamental point considered by the Court, Santana readily concluded that the suspect's "act of retreating into her house" could not be allowed to "thwart an otherwise proper arrest." 427 U.S. at 42. In reaching that conclusion, the Court cited Warden v. Hayden, 387 U.S. 294 (1967). Santana summed up the holding of Hayden: "[W]e recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few minutes before, to make a warrantless entry to arrest the robber and to search for weapons." Id. Although Hayden involved the obvious dangers associated with a fleeing armed robber, no similar danger was involved in Santana. Instead, Santana simply mentions the potential destruction of evidence: "Once Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence." Id. at 43.

On this point, there is no material distinction between the circumstances present in Santana and those present here. When Markus fled, there was a "realistic expectation that any delay" in apprehending Markus "would result in destruction of evidence." The majority here is fixated on a sideshow—the marijuana cigarette that Markus threw to the ground. But it is reasonable for the police to believe that a person they observe smoking a marijuana cigarette may

- 41 -

well be in possession of additional marijuana. And the expectation that the suspect possesses contraband is substantially heightened when the suspect commits an additional offense by fleeing from the police. Flight signals that further mischief may be afoot. Cf. Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). When a suspect has been observed committing a misdemeanor, the possession of contraband that will aggravate the suspect's criminal liability is reasonably understood by the police to be a likely motive for the suspect's flight. Although it plays no part in the Fourth Amendment analysis, Markus in fact had the motive of avoiding felony charges for possession of a firearm by a convicted felon.

In any event, there is no indication in Santana that the potential for the destruction of evidence is a necessary precondition for application of the broad rule announced in Santana. That rule is stated in Santana's holding without any such qualification: "We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under Watson, by the expedient of escaping to a private place." Santana, 427 U.S. at 43.

This rule announced in Santana is a clear rule that provides a workable guide for police conduct, and the rule squarely applies here. An arrest was "set in motion in a public place" and Markus sought to "defeat" that arrest "by the expedient of

- 42 -

escaping to a private place." The majority here unjustifiably rewrites the rule to limit its scope by imposing an analytical framework on <u>Santana</u> that the reasoning of the case cannot support.

## II.

The mischaracterization of the nature of the pursuit involved in this case further demonstrates the majority's misunderstanding of <u>Santana</u>. On this point, the majority is wrong on both the facts and the law. The majority states that the police pursuit of Markus "was not hot pursuit" but was "slow pursuit at best." Majority op. at 31. In support of this conclusion, the majority states: "Markus did not jump over a fence or cross into a neighboring yard; rather, the evidence shows that Markus walked backwards with his hands up, and moved a few feet into his open garage/recreation room." <u>Id.</u> But this recitation of the facts ignores the fact that the trial court made the factual finding that Markus fled, based on the testimony of the law enforcement officer, which was specifically credited by the trial court. <u>See</u> <u>State v. Markus</u>, No. 16-2010-CF-4169-AXXX-MA (Fla. 4th Cir. Ct. Feb. 2, 2012) (Order Denying Defendant's Amended Motion to Suppress at 5). As the majority itself acknowledges, "the trial court found that [the officer's] testimony that Markus turned around and fled into the home was more credible than [the co-resident's] testimony that Markus walked backwards into

- 43 -

the recreation room." Majority op. at 8. The trial court specifically found that after backing away from the officer when commanded to stop, "[w]hen [Markus] was commanded to stop a third time, he turned around and ran towards the open garage." See State v. Markus, No. 16-2010-CF-4169-AXXX-MA (Fla. 4th Cir. Ct. Feb. 2, 2012) (Order Denying Defendant's Amended Motion to Suppress at 3). And we are obligated to defer to the trial court's factual findings and credibility determinations so long as they are supported by competent, substantial evidence. E.g., State v. Hankerson, 65 So. 3d 502, 506 (Fla. 2011); Ruiz v. State, 50 So. 3d 1229, 1233 (Fla. 4th DCA 2011).[9]

Even if the majority were justified in its reliance on the version of the facts that was contradicted by the officer's testimony, it would nonetheless be wrong on the law. The majority's opinion evidences a fundamental misunderstanding of what is required for hot pursuit. Santana makes very clear that a few steps over a short distance are a sufficient predicate for application of the hot pursuit doctrine.

Santana succinctly describes the facts related to the pursuit:

---

9. The majority levels the accusation that this dissent "distort[s] the facts." Majority op. at 1. The accusation is false. The facts recounted in this dissent are quoted from the trial court's findings of fact and from the majority opinion itself.

- 44 -

> [The police] saw Santana standing in the doorway of the house with a brown paper bag in her hand. They pulled up to within 15 feet of Santana and got out of their van, shouting "police," and displaying their identification. As the officers approached, Santana retreated into the vestibule of her house.
>
> The officers followed through the open door, catching her in the vestibule.

Santana, 427 U.S. at 40 (footnote omitted). So the full extent of Santana's flight— that is, her "retreat"—was from the threshold of her house into the vestibule. Based on these facts, the Court concluded that the case "involv[ed] a true 'hot pursuit.' " Id. at 42. The Court explained that even a very brief chase qualified for application of the doctrine:

> "[H]ot pursuit" means some sort of a chase, but it need not be an extended hue and cry "in and about [the] public streets." The fact that the pursuit here ended almost as soon as it began did not render it any the less a "hot pursuit" sufficient to justify the warrantless entry into Santana's house.

Id. at 42-43 (second alteration in original). Given the Supreme Court's ruling that the pursuit in Santana was a hot pursuit, there is no plausible path to the conclusion that the pursuit of Markus was not a hot pursuit.

## III.

According to the majority, Welsh contains a "holding that the gravity of the circumstances must be considered in cases of hot pursuit." Majority op. at 25. But Welsh—which dealt with a warrantless arrest for a noncriminal traffic offense—does not state any such holding. Indeed, Welsh rejected the

State's argument that the hot pursuit doctrine justified the warrantless arrest at issue on entirely different grounds. The Court held that "the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime." Welsh, 466 U.S. at 753.

Since there was no "chase," there could be no "hot pursuit." Consideration of the "gravity of the circumstances" therefore played no part in the holding of Welsh on the hot pursuit issue.[10] In the absence of any hot pursuit, the Welsh Court could not apply to the State's hot pursuit claim the holding "that an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." Id.

The majority's interpretation of Welsh clashes with the Supreme Court's explanation of Welsh in Stanton. The Court in Stanton emphasized that Welsh was not a hot pursuit case: "[W]e rejected the suggestion that the hot pursuit exception applied: 'there was no immediate or continuous pursuit

_____

10. The majority also relies on McDonald v. United States, 335 U.S. 451 (1948), and Riggs v. State, 918 So. 2d 274 (Fla. 2005), to support the proposition that a "grave emergency" must exist in order to justify a warrantless entry made during a hot pursuit. See majority op. at 24-25. But, like Welsh, neither McDonald nor Riggs were hot pursuit cases. See McDonald, 335 U.S. at 454-55 (holding that a warrantless entry made during a months-long surveillance operation violated the Fourth Amendment); Riggs, 918 So. 2d at 279, 283 (holding that a warrantless entry based on "a feared medical emergency" was reasonable).

of [Welsh] from the scene of a crime.' " Stanton, 134 S. Ct. at 6 (second

alteration in original) (quoting Welsh, 466 U.S. at 753). Likewise, Stanton

refuted any suggestion that Welsh's comments about the importance of

considering the gravity of an offense apply to the hot pursuit exigency:

"[D]espite our emphasis in Welsh on the fact that the crime at issue was

minor—indeed, a mere nonjailable civil offense—nothing in the opinion

establishes that the seriousness of the crime is equally important in cases of

hot pursuit." Id.; see also Illinois v. McArthur, 531 U.S. 326, 336 (2001)

(emphasizing that Welsh turned on the distinction between "jailable" and

"nonjailable" misconduct).

With respect to the scope of exigencies other than hot pursuit, Stanton

takes pains to refute a simplistic reading of Welsh. Stanton points out that

Welsh "did not lay down a categorical rule for all cases involving minor

offenses, saying only that a warrant is 'usually' required." Stanton, 134 S. Ct.

at 6 (quoting Welsh, 466 U.S. at 750). Thus, "even in the portion of Welsh"

addressing exigencies other than hot pursuit the decision "is equivocal,"

holding "not that warrantless entry to arrest a misdemeanant is never justified,

but only that such entry should be rare." Id. (citing Welsh, 466 U.S. at 753).

This Court is, of course, bound by the Supreme Court's understanding

of its own precedents, at least when that understanding is—as in Stanton—

part of the reasoning that supports the decision in the case.  Contrary to the majority's approach, <u>Stanton</u>'s explanation of the scope of <u>Welsh</u> cannot be cavalierly dismissed.

As <u>Stanton</u> makes clear, <u>Welsh</u> contains no holding that creates an exception from <u>Santana</u>'s categorical rule that a suspect cannot thwart a proper arrest that has been initiated in a public place by fleeing to a private place.  Nothing in the Supreme Court's decisions supports the majority's divergence from <u>Santana</u> to create a categorical rule that the hot pursuit doctrine does not apply to suspects who are pursued by the police for a nonviolent misdemeanor.

## IV.

The Fourth Amendment's prohibition on "unreasonable searches and seizures" is a bulwark of liberty and a critical check on the abuse of police power, but it does not grant a license to defy the lawful exercise of police authority.  The majority has forgotten that the rights guaranteed by the Fourth Amendment are part of a scheme of ordered liberty.  <u>See</u> <u>Wolf v. Colorado</u>, 338 U.S. 25, 27-28 (1949) ("The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society.  It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process

Clause."), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961).

Granting a license to defy lawful police authority—as the majority does

through this decision—subverts rather than supports the scheme of ordered

liberty of which the Fourth Amendment is an important element. Ordered

liberty is eroded when the disorder of unlawful flight is encouraged.

As one court has cogently explained:

> Law enforcement is not a child's game of prisoners base, or a contest, with apprehension and conviction depending upon whether the officer or defendant is the fleetest of foot. A police officer in continuous pursuit of a perpetrator of a crime committed in the officer's presence, be it a felony or a misdemeanor, must be allowed to follow the suspect into a private place, or the suspect's home if he chooses to flee there, and effect the arrest without a warrant. A contrary rule would encourage flight to avoid apprehension and identification . . . .

State v. Blake, 468 N.E.2d 548, 553 (Ind. Ct. App. 1984).

Markus should not be rewarded for his defiance of the lawfully exercised

authority of the police. I would therefore quash the decision of the First District,

and I would approve the conflict decision of the Third District in Ulysse.

POLSTON, J., concurs.

Application for Review of the Decision of the District Court of Appeal – Direct
Conflict of Decisions

First District - Case No. 1D13-6152

(Duval County)

Pamela Jo Bondi, Attorney General, Trisha Meggs Pate, Bureau Chief, and Michael Layton Schaub, Assistant Attorney General, Tallahassee, Florida,

for Petitioner

William J. Sheppard, Elizabeth Louise White, Matthew R. Kachergus, Jesse Barron Wilkison, and Bryan Everett DeMaggio of Sheppard, White, Kachergus & DeMaggio, P.A., Jacksonville, Florida,

for Respondent